WALKER ET AL. *v.* CITY OF BIRMINGHAM.

No. 249.   Argued March 13–14, 1967.—Decided June 12, 1967.

*Jack Greenberg* argued the cause for petitioners. With him on the briefs were *James M. Nabrit III, Norman C. Amaker, Leroy D. Clark, Charles Stephen Ralston, Arthur D. Shores, Orzell Billingsley, Jr.,* and *Anthony G. Amsterdam.*

*Earl McBee* and *J. M. Breckenridge* argued the cause for respondent. With them on the brief was *William C. Walker.*

*Louis F. Claiborne,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Marshall* and *Assistant Attorney General Doar.*

MR. JUSTICE STEWART delivered the opinion of the Court.

On Wednesday, April 10, 1963, officials of Birmingham, Alabama, filed a bill of complaint in a state circuit court asking for injunctive relief against 139 individuals and

two organizations. The bill and accompanying affidavits stated that during the preceding seven days:

> "[R]espondents [had] sponsored and/or participated in and/or conspired to commit and/or to encourage and/or to participate in certain movements, plans or projects commonly called 'sit-in' demonstrations, 'kneel-in' demonstrations, mass street parades, trespasses on private property after being warned to leave the premises by the owners of said property, congregating in mobs upon the public streets and other public places, unlawfully picketing private places of business in the City of Birmingham, Alabama; violation of numerous ordinances and statutes of the City of Birmingham and State of Alabama . . . ."

It was alleged that this conduct was "calculated to provoke breaches of the peace," "threaten[ed] the safety, peace and tranquility of the City," and placed "an undue burden and strain upon the manpower of the Police Department."

The bill stated that these infractions of the law were expected to continue and would "lead to further imminent danger to the lives, safety, peace, tranquility and general welfare of the people of the City of Birmingham," and that the "remedy by law [was] inadequate." The circuit judge granted a temporary injunction as prayed in the bill, enjoining the petitioners from, among other things, participating in or encouraging mass street parades or mass processions without a permit as required by a Birmingham ordinance.[1]

---

[1] The text of the injunction is reproduced as Appendix A to this opinion.

The Birmingham parade ordinance, § 1159 of the Birmingham City Code, provides that:

"It shall be unlawful to organize or hold, or to assist in organizing or holding, or to take part or participate in, any parade or procession

310

Five of the eight petitioners were served with copies of the writ early the next morning. Several hours later four of them held a press conference. There a statement was distributed, declaring their intention to disobey the injunction because it was "raw tyranny under the guise of maintaining law and order." [2] At this press conference one of the petitioners stated: "That they had respect for the Federal Courts, or Federal Injunctions, but in the past the State Courts had favored local law enforcement, and if the police couldn't handle it, the mob would."

That night a meeting took place at which one of the petitioners announced that "[i]njunction or no injunction we are going to march tomorrow." The next afternoon, Good Friday, a large crowd gathered in the vicinity of Sixteenth Street and Sixth Avenue North in Birmingham. A group of about 50 or 60 proceeded to parade along the sidewalk while a crowd of 1,000 to 1,500 onlookers stood by, "clapping, and hollering, and [w]hoop-

---

or other public demonstration on the streets or other public ways of the city, unless a permit therefor has been secured from the commission.

"To secure such permit, written application shall be made to the commission, setting forth the probable number of persons, vehicles and animals which will be engaged in such parade, procession or other public demonstration, the purpose for which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or other public demonstration. The commission shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused. It shall be unlawful to use for such purposes any other streets or public ways than those set out in said permit.

"The two preceding paragraphs, however, shall not apply to funeral processions."

[2] The full statement is reproduced as Appendix B to this opinion.

ing." Some of the crowd followed the marchers and spilled out into the street. At least three of the petitioners participated in this march.

Meetings sponsored by some of the petitioners were held that night and the following night, where calls for volunteers to "walk" and go to jail were made. On Easter Sunday, April 14, a crowd of between 1,500 and 2,000 people congregated in the midafternoon in the vicinity of Seventh Avenue and Eleventh Street North in Birmingham. One of the petitioners was seen organizing members of the crowd in formation. A group of about 50, headed by three other petitioners, started down the sidewalk two abreast. At least one other petitioner was among the marchers. Some 300 or 400 people from among the onlookers followed in a crowd that occupied the entire width of the street and overflowed onto the sidewalks. Violence occurred. Members of the crowd threw rocks that injured a newspaperman and damaged a police motorcycle.

The next day the city officials who had requested the injunction applied to the state circuit court for an order to show cause why the petitioners should not be held in contempt for violating it. At the ensuing hearing the petitioners sought to attack the constitutionality of the injunction on the ground that it was vague and overbroad, and restrained free speech. They also sought to attack the Birmingham parade ordinance upon similar grounds, and upon the further ground that the ordinance had previously been administered in an arbitrary and discriminatory manner.

The circuit judge refused to consider any of these contentions, pointing out that there had been neither a motion to dissolve the injunction, nor an effort to comply with it by applying for a permit from the city commission before engaging in the Good Friday and Easter Sunday parades. Consequently, the court held that the

only issues before it were whether it had jurisdiction to issue the temporary injunction, and whether thereafter the petitioners had knowingly violated it. Upon these issues the court found against the petitioners, and imposed upon each of them a sentence of five days in jail and a $50 fine, in accord with an Alabama statute.[3]

The Supreme Court of Alabama affirmed.[4] That court, too, declined to consider the petitioners' constitutional

---

[3] "The circuit court, or judges thereof when exercising equity jurisdiction and powers may punish for contempt by fine not exceeding fifty dollars, and by imprisonment, not exceeding five days, one or both." Ala. Code, Tit. 13, § 143. See also *id.*, §§ 4–5, 126.

The circuit court dismissed the contempt proceedings against several individuals on grounds of insufficient evidence.

Those petitioners who participated in the April 11 press conference contend that the circuit court improperly relied on this incident in finding them guilty of contempt, claiming that they were engaged in constitutionally protected free speech. We find no indication that the court considered the incident for any purpose other than the legitimate one of establishing that the participating petitioners' subsequent violation of the injunction by parading without a permit was willful and deliberate.

[4] The Alabama Supreme Court quashed the conviction of one defendant because of insufficient proof that he knew of the injunction before violating it, and the convictions of two others because there was no showing that they had disobeyed the order. 279 Ala. 53, 64, 181 So. 2d 493, 504.

Two of the petitioners here claim that there was a complete dearth of evidence to establish that they had knowledge of the injunction before violating it, and that their convictions are therefore constitutionally defective under the principle of *Thompson v. Louisville,* 362 U. S. 199. The Alabama Supreme Court's recitation of the evidence on this issue, which is supported by the record, plainly shows this claim is without foundation. It is, of course, a familiar doctrine that proof of the elements of criminal contempt may be established by circumstantial evidence. *Bullock v. United States,* 265 F. 2d 683, cert. denied *sub nom. Kasper v. United States,* 360 U. S. 932.

attacks upon the injunction and the underlying Birmingham parade ordinance:

> "It is to be remembered that petitioners are charged with violating a temporary injunction. We are not reviewing a denial of a motion to dissolve or discharge a temporary injunction. Petitioners did not file any motion to vacate the temporary injunction until after the Friday and Sunday parades. Instead, petitioners deliberately defied the order of the court and did engage in and incite others to engage in mass street parades without a permit.

> .          .          .          .          .

> "We hold that the circuit court had the duty and authority, in the first instance, to determine the validity of the ordinance, and, until the decision of the circuit court is reversed for error by orderly review, either by the circuit court or a higher court, the orders of the circuit court based on its decision are to be respected and disobedience of them is contempt of its lawful authority, to be punished. Howat v. State of Kansas, 258 U. S. 181." 279 Ala. 53, 60, 62–63, 181 So. 2d 493, 500, 502.

*Howat* v. *Kansas,* 258 U. S. 181, was decided by this Court almost 50 years ago. That was a case in which people had been punished by a Kansas trial court for refusing to obey an antistrike injunction issued under the state industrial relations act. They had claimed a right to disobey the court's order upon the ground that the state statute and the injunction based upon it were invalid under the Federal Constitution. The Supreme Court of Kansas had affirmed the judgment, holding that the trial court "had general power to issue injunctions in equity and that, even if its exercise of the power was erroneous, the injunction was not void, and the defendants were pre-

cluded from attacking it in this collateral proceeding . . . that, if the injunction was erroneous, jurisdiction was not thereby forfeited, that the error was subject to correction only by the ordinary method of appeal, and disobedience to the order constituted contempt." 258 U. S., at 189.

This Court, in dismissing the writ of error, not only unanimously accepted but fully approved the validity of the rule of state law upon which the judgment of the Kansas court was grounded:

> "An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." 258 U. S., at 189–190.

The rule of state law accepted and approved in *Howat* v. *Kansas* is consistent with the rule of law followed by the federal courts.[5]

---

[5] *Brougham* v. *Oceanic Steam Navigation Co.*, 205 F. 857; *Trickett* v. *Kaw Valley Drainage Dist.*, 25 F. 2d 851, cert. denied, 278 U. S. 624; *O'Hearne* v. *United States*, 62 App. D. C. 285, 66 F. 2d 933, cert. denied, 290 U. S. 683; *Locke* v. *United States*, 75 F. 2d 157, cert. denied, 295 U. S. 733; *McCann* v. *New York Stock Exchange*, 80 F. 2d 211, cert. denied *sub nom. McCann* v. *Leibell*, 299 U. S. 603; *McLeod* v. *Majors*, 102 F. 2d 128; *Kasper* v. *Brittain*, 245 F. 2d 92,

In the present case, however, we are asked to hold that this rule of law, upon which the Alabama courts relied, was constitutionally impermissible. We are asked to say that the Constitution compelled Alabama to allow the petitioners to violate this injunction, to organize and engage in these mass street parades and demonstrations, without any previous effort on their part to have the injunction dissolved or modified, or any attempt to secure a parade permit in accordance with its terms. Whatever the limits of *Howat* v. *Kansas*,[6] we cannot accept the petitioners' contentions in the circumstances of this case.

Without question the state court that issued the injunction had, as a court of equity, jurisdiction over the petitioners and over the subject matter of the controversy.[7] And this is not a case where the injunction was transparently invalid or had only a frivolous pretense to validity. We have consistently recognized the strong interest of state and local governments in regulating the use of their streets and other public places. *Cox* v. *New Hampshire*, 312 U. S. 569; *Kovacs* v. *Cooper*, 336 U. S. 77; *Poulos* v. *New Hampshire*, 345 U. S. 395; *Adderley*

cert. denied, 355 U. S. 834. See also *Ex parte Rowland*, 104 U. S. 604; *In re Ayers*, 123 U. S. 443; *In re Burrus*, 136 U. S. 586; *United States* v. *Shipp*, 203 U. S. 563; *United States* v. *Mine Workers*, 330 U. S. 258.

[6] In *In re Green*, 369 U. S. 689, the petitioner was convicted of criminal contempt for violating a labor injunction issued by an Ohio court. Relying on the pre-emptive command of the federal labor law, the Court held that the state courts were required to hear Green's claim that the state court was *without jurisdiction* to issue the injunction. The petitioner in *Green*, unlike the petitioners here, had attempted to challenge the validity of the injunction *before* violating it by promptly applying to the issuing court for an order vacating the injunction. The petitioner in *Green* had further offered to prove that the court issuing the injunction had agreed to its violation as an appropriate means of testing its validity.

[7] Ala. Const., Art. 6, § 144; Ala. Code, Tit. 7, §§ 1038–1039.

v. *Florida,* 385 U. S. 39. When protest takes the form
of mass demonstrations, parades, or picketing on public
streets and sidewalks, the free passage of traffic and the
prevention of public disorder and violence become im-
portant objects of legitimate state concern. As the Court
stated, in *Cox* v. *Louisiana,* "We emphatically reject the
notion . . . that the First and Fourteenth Amendments
afford the same kind of freedom to those who would
communicate ideas by conduct such as patrolling, march-
ing, and picketing on streets and highways, as these
amendments afford to those who communicate ideas by
pure speech." 379 U. S. 536, 555. And as a unanimous
Court stated in *Cox* v. *New Hampshire:*

> "Civil liberties, as guaranteed by the Constitution,
> imply the existence of an organized society main-
> taining public order without which liberty itself
> would be lost in the excesses of unrestrained abuses.
> The authority of a municipality to impose regula-
> tions in order to assure the safety and convenience
> of the people in the use of public highways has
> never been regarded as inconsistent with civil
> liberties but rather as one of the means of safe-
> guarding the good order upon which they ultimately
> depend." 312 U. S., at 574.

The generality of the language contained in the Bir-
mingham parade ordinance upon which the injunction
was based would unquestionably raise substantial con-
stitutional issues concerning some of its provisions.[8]
*Schneider* v. *State,* 308 U. S. 147; *Saia* v. *New York,*
334 U. S. 558; *Kunz* v. *New York,* 340 U. S. 290. The
petitioners, however, did not even attempt to apply to
the Alabama courts for an authoritative construction of
the ordinance. Had they done so, those courts might
have given the licensing authority granted in the ordi-

---

[8] See n. 1, *supra.*

nance a narrow and precise scope, as did the New Hampshire courts in *Cox* v. *New Hampshire* and *Poulos* v. *New Hampshire,* both *supra.* Cf. *Shuttlesworth* v. *Birmingham,* 382 U. S. 87, 91; *City of Darlington* v. *Stanley,* 239 S. C. 139, 122 S. E. 2d 207. Here, just as in *Cox* and *Poulos,* it could not be assumed that this ordinance was void on its face.

The breadth and vagueness of the injunction itself would also unquestionably be subject to substantial constitutional question. But the way to raise that question was to apply to the Alabama courts to have the injunction modified or dissolved. The injunction in all events clearly prohibited mass parading without a permit, and the evidence shows that the petitioners fully understood that prohibition when they violated it.

The petitioners also claim that they were free to disobey the injunction because the parade ordinance on which it was based had been administered in the past in an arbitrary and discriminatory fashion. In support of this claim they sought to introduce evidence that, a few days before the injunction issued, requests for permits to picket had been made to a member of the city commission. One request had been rudely rebuffed,[9] and this same official had later made clear that he

---

[9] Mrs. Lola Hendricks, *not* a petitioner in this case, testified that on April 3:

"I went to Mr. Connor's office, the Commissioner's office at the City Hall Building. We went up and Commissioner Connor met us at the door. He asked, 'May I help you?' I told him, 'Yes, sir, we came up to apply or see about getting a permit for picketing, parading, demonstrating.'

.        .        .        .        .

"I asked Commissioner Connor for the permit, and asked if he could issue the permit, or other persons who would refer me to, persons who would issue a permit. He said, 'No, you will not get a permit in Birmingham, Alabama to picket. I will picket you over to the City Jail,' and he repeated that twice."

was without power to grant the permit alone, since the issuance of such permits was the responsibility of the entire city commission.[10] Assuming the truth of this proffered evidence, it does not follow that the parade ordinance was void on its face. The petitioners, moreover, did not apply for a permit either to the commission itself or to any commissioner after the injunction issued. Had they done so, and had the permit been refused, it is clear that their claim of arbitrary or discriminatory administration of the ordinance would have been considered by the state circuit court upon a motion to dissolve the injunction.[11]

This case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims. But there is no showing that such would have been the fate of a timely motion to modify or dissolve the injunction. There was an interim of two

---

[10] Commissioner Connor sent the following telegram to one of the petitioners on April 5:

"Under the provisions of the city code of the City of Birmingham, a permit to picket as requested by you cannot be granted by me individually but is the responsiboity [sic] of the entire commission. I insist that you and your people do not start any picketing on the streets in Birmingham, Alabama.

"Eugene 'Bull' Connor, Commissioner of Public Safety."

[11] In its opinion, that court stated: "The legal and orderly processes of the Court would require the defendants to attack the unreasonable denial of such permit by the Commission of the City of Birmingham through means of a motion to dissolve the injunction at which time this Court would have the opportunity to pass upon the question of whether or not a compliance with the ordinance was attempted and whether or not an arbitrary and capricious denial of such request was made by the Commission of the City of Birmingham. Since this course of conduct was not sought by the defendants, the Court is of the opinion that the validity of its injunction order stands upon its prima facie authority to execute the same."

days between the issuance of the injunction and the Good Friday march. The petitioners give absolutely no explanation of why they did not make some application to the state court during that period. The injunction had issued *ex parte;* if the court had been presented with the petitioners' contentions, it might well have dissolved or at least modified its order in some respects. If it had not done so, Alabama procedure would have provided for an expedited process of appellate review.[12] It cannot be presumed that the Alabama courts would have ignored the petitioners' constitutional claims. Indeed, these contentions were accepted in another case by an Alabama appellate court that struck down on direct review the conviction under this very ordinance of one of these same petitioners.[13]

The rule of law upon which the Alabama courts relied in this case was one firmly established by previous precedents. We do not deal here, therefore, with a situation where a state court has followed a regular past practice of entertaining claims in a given procedural mode, and without notice has abandoned that practice to the detriment of a litigant who finds his claim foreclosed by a novel procedural bar. *Barr* v. *City of Columbia,* 378 U. S. 146. This is not a case where a procedural requirement has been sprung upon an unwary litigant when prior practice did not give him fair notice of its existence. *Wright* v. *Georgia,* 373 U. S. 284, 291.

The Alabama Supreme Court has apparently never in any criminal contempt case entertained a claim of nonjurisdictional error.[14] In *Fields* v. *City of Fairfield,* 273

---

[12] Ala. Code, Tit. 7 App., Sup. Ct. Rule 47.

[13] *Shuttlesworth* v. *City of Birmingham,* 43 Ala. App. 68, 180 So. 2d 114. The case is presently pending on certiorari review in the Alabama Supreme Court.

[14] As early as 1904, the Alabama Supreme Court noted that: "An evident distinction is to be made in contempt proceedings for the

Ala. 588, 143 So. 2d 177,[15] decided just three years before the present case, the defendants, members of a "White Supremacy" organization who had disobeyed an injunction, sought to challenge the constitutional validity of a permit ordinance upon which the injunction was based. The Supreme Court of Alabama, finding that the trial court had jurisdiction, applied the same rule of law which was followed here:

"As a general rule, an unconstitutional statute is an absolute nullity and may not form the basis of any legal right or legal proceedings, yet until its unconstitutionality has been judicially declared in appropriate proceedings, no person charged with its observance under an order or decree may disregard or violate the order or the decree with immunity from a charge of contempt of court; and he may not raise the question of its unconstitutionality in collateral proceedings on appeal from a judgment of conviction for contempt of the order or decree . . . ." 273 Ala., at 590, 143 So. 2d, at 180.

These precedents clearly put the petitioners on notice that they could not bypass orderly judicial review of the injunction before disobeying it. Any claim that they were entrapped or misled is wholly unfounded, a conclusion confirmed by evidence in the record showing that when the petitioners deliberately violated the injunction they expected to go to jail.

The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted

violation of the writ of injunction, where the writ is improvidently or irregularly issued, and where it is issued without jurisdiction . . . ." *Old Dominion Telegraph Co.* v. *Powers*, 140 Ala. 220, 226, 37 So. 195, 197. See *Board of Revenue of Covington County* v. *Merrill*, 193 Ala. 521, 68 So. 971.

[15] Reversed on other grounds, 375 U. S. 248.

his station, however righteous his motives, and irrespective of his race, color, politics, or religion.[16]  This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets.  One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

*Affirmed.*

## APPENDIX A TO OPINION OF THE COURT.

"TEMPORARY INJUNCTION—April 10, 1963.

"A verified Bill of Complaint in the above styled cause having been presented to me on this the 10th of April 1963 at 9:00 O'Clock P. M. in the City of Birmingham, Alabama.

"Upon consideration of said verified Bill of Complaint and the affidavits of Captain G. V. Evans and Captain George Wall, and the public welfare, peace and safety requiring it, it is hereby considered, ordered, adjudged and decreed that a peremptory or a temporary writ of injunction be and the same is hereby issued in accordance with the prayer of said petition.

---

[16] The same rule of law was followed in *Kasper* v. *Brittain,* 245 F. 2d 92.  There, a federal court had ordered the public high school in Clinton, Tennessee, to desegregate.  Kasper "arrived from somewhere in the East," and organized a campaign "to run the Negroes out of the school."  The federal court issued an *ex parte* restraining order enjoining Kasper from interfering with desegregation.  Relying upon the First Amendment, Kasper harangued a crowd "to the effect that although he had been served with the restraining order, it did not mean anything . . . ."  His conviction for criminal contempt was affirmed by the Court of Appeals for the Sixth Circuit. That court concluded that "an injunctional order issued by a court must be obeyed," whatever its seeming invalidity, citing *Howat* v. *Kansas,* 258 U. S. 181.  This Court denied certiorari, 355 U. S. 834.

"It is therefore ordered, adjudged and decreed by the Court that upon the complainant entering into a good and sufficient bond conditioned as provided by law, in the sum of Twenty five Hundred Dollars ($2500.00), same to be approved by the Register of this Court that the Register issue a peremptory or temporary writ of injunction that the respondents and the others identified in said Bill of Complaint, their agents, members, employees, servants, followers, attorneys, successors and all other persons in active concert or participation with the respondents and all persons having notice of said order from continuing any act hereinabove designated particularly: engaging in, sponsoring, inciting or encouraging mass street parades or mass processions or like demonstrations without a permit, trespass on private property after being warned to leave the premises by the owner or person in possession of said private property, congregating on the street or public places into mobs, and unlawfully picketing business establishments or public buildings in the City of Birmingham, Jefferson County, State of Alabama or performing acts calculated to cause breaches of the peace in the City of Birmingham, Jefferson County, in the State of Alabama or from conspiring to engage in unlawful street parades, unlawful processions, unlawful demonstrations, unlawful boycotts, unlawful trespasses, and unlawful picketing or other like unlawful conduct or from violating the ordinances of the City of Birmingham and the Statutes of the State of Alabama or from doing any acts designed to consummate conspiracies to engage in said unlawful acts of parading, demonstrating, boycotting, trespassing and picketing or other unlawful acts, or from engaging in acts and conduct customarily known as 'kneel-ins' in churches in violation of the wishes and desires of said churches.

"W. A. Jenkins, Jr., As Circuit Judge of the Tenth Judicial Circuit of Alabama, In Equity Sitting."

## APPENDIX B TO OPINION OF THE COURT.

"In our struggle for freedom we have anchored our faith and hope in the rightness of the Constitution and the moral laws of the universe.

"Again and again the Federal judiciary has made it clear that the priviledges [sic] guaranteed under the First and the Fourteenth Amendments are to [sic] sacred to be trampled upon by the machinery of state government and police power. In the past we have abided by Federal injunctions out of respect for the forthright and consistent leadership that the Federal judiciary has given in establishing the principle of integration as the law of the land.

"However we are now confronted with recalcitrant forces in the Deep South that will use the courts to perpetuate the unjust and illegal system of racial separation.

"Alabama has made clear its determination to defy the law of the land. Most of its public officials, its legislative body and many of its law enforcement agents have openly defied the desegregation decision of the Supreme Court. We would feel morally and legal [sic] responsible to obey the injunction if the courts of Alabama applied equal justice to all of its citizens. This would be sameness made legal. However the ussuance [sic] of this injunction is a blatant of *difference* made *legal*.

"Southern law enforcement agencies have demonstrated now and again that they will utilize the force of law to misuse the judicial process.

"This is raw tyranny under the guise of maintaining law and order. We cannot in all good conscience obey such an injunction which is an unjust, undemocratic and unconstitutional misuse of the legal process.

"We do this not out of any desrespect [sic] for the law but out of the highest respect for *the* law. This is not an attempt to evade or defy the law or engage in

chaotic anarchy. Just as in all good conscience we cannot obey unjust laws, neither can we respect the unjust use of the courts.

"We believe in a system of law based on justice and morality. Out of our great love for the Constitution of the U. S. and our desire to purify the judicial system of the state of Alabama, we risk this critical move with an awareness of the possible consequences involved."

MR. CHIEF JUSTICE WARREN, whom MR. JUSTICE BRENNAN and MR. JUSTICE FORTAS join, dissenting.

Petitioners in this case contend that they were convicted under an ordinance that is unconstitutional on its face because it submits their First and Fourteenth Amendment rights to free speech and peaceful assembly to the unfettered discretion of local officials. They further contend that the ordinance was unconstitutionally applied to them because the local officials used their discretion to prohibit peaceful demonstrations by a group whose political viewpoint the officials opposed. The Court does not dispute these contentions, but holds that petitioners may nonetheless be convicted and sent to jail because the patently unconstitutional ordinance was copied into an injunction—issued *ex parte* without prior notice or hearing on the request of the Commissioner of Public Safety—forbidding all persons having notice of the injunction to violate the ordinance without any limitation of time. I dissent because I do not believe that the fundamental protections of the Constitution were meant to be so easily evaded, or that "the civilizing hand of law" would be hampered in the slightest by enforcing the First Amendment in this case.

The salient facts can be stated very briefly. Petitioners are Negro ministers who sought to express their concern about racial discrimination in Birmingham, Alabama, by holding peaceful protest demonstrations in that

city on Good Friday and Easter Sunday 1963. For obvious reasons, it was important for the significance of the demonstrations that they be held on those particular dates. A representative of petitioners' organization went to the City Hall and asked "to see the person or persons in charge to issue permits, permits for parading, picketing, and demonstrating." She was directed to Public Safety Commissioner Connor, who denied her request for a permit in terms that left no doubt that petitioners were not going to be issued a permit under any circumstances. "He said, 'No, you will not get a permit in Birmingham, Alabama to picket. I will picket you over to the City Jail,' and he repeated that twice." A second, telegraphic request was also summarily denied, in a telegram signed by "Eugene 'Bull' Connor," with the added information that permits could be issued only by the full City Commission, a three-man body consisting of Commissioner Connor and two others.[1] According to petitioners' offer

---

[1] The uncontradicted testimony relating to the rebuffs of petitioners' attempts to obtain a permit is set out in footnotes 9 and 10 of the majority opinion. Petitioners were prevented by a ruling of the trial court from introducing further proof of the intransigence of Commissioner Connor and the other city officials toward any effort by Negroes to protest segregation and racial injustice. The attitude of the city administration in general and of its Public Safety Commissioner in particular are a matter of public record, of course, and are familiar to this Court from previous litigation. See *Shuttlesworth* v. *City of Birmingham*, 382 U. S. 87 (1965); *Shuttlesworth* v. *City of Birmingham*, 376 U. S. 339 (1964); *Shuttlesworth* v. *City of Birmingham*, 373 U. S. 262 (1963); *Gober* v. *City of Birmingham*, 373 U. S. 374 (1963); *In re Shuttlesworth*, 369 U. S. 35 (1962). The United States Commission on Civil Rights found continuing abuse of civil rights protesters by the Birmingham police, including use of dogs, clubs, and firehoses. 1963 Report of the United States Commission on Civil Rights 114 (Government Printing Office, 1963). Commissioner Eugene "Bull" Connor, a self-proclaimed white supremacist (see Congress and the Nation 1945–1964: A Review of Government and Politics in the Postwar Years 1604 (Con-

of proof, the truth of which is assumed for purposes of this case, parade permits had uniformly been issued for all other groups by the city clerk on the request of the traffic bureau of the police department, which was under Commissioner Connor's direction. The requirement that the approval of the full Commission be obtained was applied only to this one group.

Understandably convinced that the City of Birmingham was not going to authorize their demonstrations under any circumstances, petitioners proceeded with their plans despite Commissioner Connor's orders. On Wednesday, April 10, at 9 in the evening, the city filed in a state circuit court a bill of complaint seeking an *ex parte* injunction. The complaint recited that petitioners were engaging in a series of demonstrations as "part of a massive effort . . . to forcibly integrate all business establishments, churches, and other institutions" in the city, with the result that the police department was strained in its resources and the safety, peace, and tranquility were threatened. It was alleged as particularly menacing that petitioners were planning to conduct "kneel-in" demonstrations at churches where their presence was not wanted. The city's police dogs were said to be in danger of their lives. Faced with these recitals, the Circuit Court issued the injunction in the form requested, and in effect ordered petitioners and all other persons having notice of the order to refrain for an unlimited time from carrying on any demonstrations without a permit. A permit, of course, was clearly unobtain-

gressional Quarterly Service, 1965)), made no secret of his personal attitude toward the rights of Negroes and the decisions of this Court. He vowed that racial integration would never come to Birmingham, and wore a button inscribed "Never" to advertise that vow. Yet the Court indulges in speculation that these civil rights protesters might have obtained a permit from this city and this man had they made enough repeated applications.

able; the city would not have sought this injunction if it had any intention of issuing one.

Petitioners were served with copies of the injunction at various times on Thursday and on Good Friday. Unable to believe that such a blatant and broadly drawn prior restraint on their First Amendment rights could be valid, they announced their intention to defy it and went ahead with the planned peaceful demonstrations on Easter weekend. On the following Monday, when they promptly filed a motion to dissolve the injunction, the court found them in contempt, holding that they had waived all their First Amendment rights by disobeying the court order.

These facts lend no support to the court's charges that petitioners were presuming to act as judges in their own case, or that they had a disregard for the judicial process. They did not flee the jurisdiction or refuse to appear in the Alabama courts. Having violated the injunction, they promptly submitted themselves to the courts to test the constitutionality of the injunction and the ordinance it parroted. They were in essentially the same position as persons who challenge the constitutionality of a statute by violating it, and then defend the ensuing criminal prosecution on constitutional grounds. It has never been thought that violation of a statute indicated such a disrespect for the legislature that the violator always must be punished even if the statute was unconstitutional. On the contrary, some cases have required that persons seeking to challenge the constitutionality of a statute first violate it to establish their standing to sue.[2] Indeed, it shows no disrespect for law to violate a statute on the ground that it is unconstitutional and then to submit one's case to the courts with the willingness to accept the penalty if the statute is held to be valid.

---

[2] See *United Public Workers* v. *Mitchell,* 330 U. S. 75, 86–94 (1947).

The Court concedes that "[t]he generality of the language contained in the Birmingham parade ordinance upon which the injunction was based would unquestionably raise substantial constitutional issues concerning some of its provisions." [3] *Ante*, p. 316. That concession is well-founded but minimal. I believe it is patently unconstitutional on its face. Our decisions have consistently held that picketing and parading are means of expression protected by the First Amendment, and that the right to picket or parade may not be subjected to the unfettered discretion of local officials. *Cox* v. *Louisiana*, 379 U. S. 536 (1965); *Edwards* v. *South Carolina*, 372 U. S. 229 (1963); *Thornhill* v. *Alabama*, 310 U. S. 88 (1940). Although a city may regulate the manner of use of its streets and sidewalks in the interest of keeping them open for the movement of traffic, it may not allow local officials unbridled discretion to decide who shall be allowed to parade or picket and who shall not. "Wherever the title of streets and parks may rest, they have immemorially been held

---

[3] The opinion does speculate that the Alabama courts might have saved the ordinance by giving the licensing authority granted in the ordinance "a narrow and precise scope," as did the New Hampshire courts in *Cox* v. *New Hampshire*, 312 U. S. 569 (1941), and *Poulos* v. *New Hampshire*, 345 U. S. 395 (1953). This suggestion ignores the fact that the statute in *Cox* and the ordinance in *Poulos* merely provided that licenses for parades and certain other gatherings must be obtained. They did not authorize local officials to determine whether the proposed parade was consistent with "the public welfare, peace, safety, health, decency, good order, morals or convenience," as does the Birmingham ordinance involved in this case, and so it was perfectly consistent with the statutory language for the New Hampshire Supreme Court to hold that under the statute and ordinance parade applicants had a right to a license "with regard only to considerations of time, place and manner so as to conserve the public convenience." 312 U. S., at 575-576. By contrast, the Alabama courts could only give a narrow and precise scope to the Birmingham ordinance by repealing some of its language.

in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." *Hague* v. *C. I. O.,* 307 U. S. 496, 515–516 (1939) (opinion of Mr. Justice Roberts). When local officials are given totally unfettered discretion to decide whether a proposed demonstration is consistent with "public welfare, peace, safety, health, decency, good order, morals or convenience," as they were in this case, they are invited to act as censors over the views that may be presented to the public.[4] The unconstitutionality of the ordinance is compounded, of course, when there is convincing evidence that the officials have in fact used their power to deny permits to organizations whose views they dislike.[5] The record in this case hardly suggests that Commissioner Connor and the other city officials were motivated in prohibiting civil rights picketing only by their overwhelming concern for particular traffic problems. Petitioners were given to

---

[4] *Staub* v. *City of Baxley,* 355 U. S. 313 (1958); *Kunz* v. *New York,* 340 U. S. 290 (1951); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940).

"I believe that the First and Fourteenth Amendments require that if the streets of a town are open to some views, they must be open to all." *Cox* v. *Louisiana,* 379 U. S. 536, 580 (1965) (opinion of Mr. Justice Black).

[5] *Niemotko* v. *Maryland, supra.*

understand that under no circumstances would they be permitted to demonstrate in Birmingham, not that a demonstration would be approved if a time and place were selected that would minimize the traffic difficulties. The only circumstance that the court can find to justify anything other than a *per curiam* reversal is that Commissioner Connor had the foresight to have the unconstitutional ordinance included in an *ex parte* injunction, issued without notice or hearing or any showing that it was impossible to have notice or a hearing, forbidding the world at large (insofar as it knew of the order) to conduct demonstrations in Birmingham without the consent of the city officials. This injunction was such potent magic that it transformed the command of an unconstitutional statute into an impregnable barrier, challengeable only in what likely would have been protracted legal proceedings and entirely superior in the meantime even to the United States Constitution.

I do not believe that giving this Court's seal of approval to such a gross misuse of the judicial process is likely to lead to greater respect for the law any more than it is likely to lead to greater protection for First Amendment freedoms. The *ex parte* temporary injunction has a long and odious history in this country, and its susceptibility to misuse is all too apparent from the facts of the case. As a weapon against strikes, it proved so effective in the hands of judges friendly to employers that Congress was forced to take the drastic step of removing from federal district courts the jurisdiction to issue injunctions in labor disputes.[6] The labor injunction fell into disrepute largely because it was abused in precisely the same way that the injunctive power was abused in this case. Judges who were not sympathetic to the union cause commonly issued, without notice or

---

[6] The Norris-LaGuardia Act, 1932, 47 Stat. 70, 29 U. S. C. §§ 101–115.

hearing, broad restraining orders addressed to large numbers of persons and forbidding them to engage in acts that were either legally permissible or, if illegal, that could better have been left to the regular course of criminal prosecution. The injunctions might later be dissolved, but in the meantime strikes would be crippled because the occasion on which concerted activity might have been effective had passed.[7] Such injunctions, so long discredited as weapons against concerted labor activities, have now been given new life by this Court as weapons against the exercise of First Amendment freedoms. Respect for the courts and for judicial process was not increased by the history of the labor injunction.[8]

Nothing in our prior decisions, or in the doctrine that a party subject to a temporary injunction issued by a court of competent jurisdiction with power to decide a dispute properly before it must normally challenge the injunction in the courts rather than by violating it, requires that we affirm the convictions in this case. The majority opinion in this case rests essentially on a single precedent, and that a case the authority of

---

[7] Frankfurter & Greene, The Labor Injunction 47–81 (1930); Cox & Bok, Cases and Materials on Labor Law 101–107 (1962).

[8] "The history of the labor injunction in action puts some matters beyond question. In large part, dissatisfaction and resentment are caused, first, by the refusal of courts to recognize that breaches of the peace may be redressed through criminal prosecution and civil action for damages, and, second, by the expansion of a simple, judicial device to an enveloping code of prohibited conduct, absorbing, *en masse*, executive and police functions and affecting the livelihood, and even lives, of multitudes. Especially those zealous for the unimpaired prestige of our courts have observed how the administration of law by decrees which through vast and vague phrases surmount law, undermines the esteem of courts upon which our reign of law depends. Not government, but 'government by injunction,' characterized by the consequences of a criminal prosecution without its safeguards, has been challenged." Frankfurter & Greene, *supra*, at 200.

which has clearly been undermined by subsequent decisions. *Howat* v. *Kansas,* 258 U. S. 181 (1922), was decided in the days when the labor injunction was in fashion. Kansas had adopted an Industrial Relations Act, the purpose of which in effect was to provide for compulsory arbitration of labor disputes by a neutral administrative tribunal, the "Court of Industrial Relations." Pursuant to its jurisdiction to investigate and perhaps improve labor conditions in the coal mining industry, the "Court" subpoenaed union leaders to appear and testify. In addition, the State obtained an injunction to prevent a strike while the matter was before the "Court." The union leaders disobeyed both the subpoena and the injunction, and sought to challenge the constitutionality of the Industrial Relations Act in the ensuing contempt proceeding. The Kansas Supreme Court held that the constitutionality of the Act could not be challenged in a contempt proceeding, and this Court upheld that determination.

Insofar as *Howat* v. *Kansas* might be interpreted to approve an absolute rule that any violation of a void court order is punishable as contempt, it has been greatly modified by later decisions. In *In re Green,* 369 U. S. 689 (1962), we reversed a conviction for contempt of a state injunction forbidding labor picketing because the petitioner was not allowed to present evidence that the labor dispute was arguably subject to the jurisdiction of the National Labor Relations Board and hence not subject to state regulation. If an injunction can be challenged on the ground that it deals with a matter arguably subject to the jurisdiction of the National Labor Relations Board, then *a fortiori* it can be challenged on First Amendment grounds.[9]

---

[9] The attempt in footnote 6 of the majority opinion to distinguish *In re Green* is nothing but an attempt to alter the holding of that case. The opinion of the Court states flatly that "a state court is

It is not necessary to question the continuing validity of the holding in *Howat* v. *Kansas,* however, to demonstrate that neither it nor the *Mine Workers*[10] case supports the holding of the majority in this case. In *Howat* the subpoena and injunction were issued to enable the Kansas Court of Industrial Relations to determine an underlying labor dispute. In the *Mine Workers* case, the District Court issued a temporary antistrike injunction to preserve existing conditions during the time it took to decide whether it had authority to grant the Government relief in a complex and difficult action of enormous importance to the national economy. In both cases the orders were of questionable legality, but in both cases they were reasonably necessary to enable the court or administrative tribunal to decide an underlying controversy of considerable importance before it at the time. This case involves an entirely different situation. The Alabama Circuit Court did not issue this temporary injunction to preserve existing conditions while it proceeded to decide some underlying dispute. There was no underlying dispute before it, and the court in practical effect merely added a judicial signature to a preexisting criminal ordinance. Just as the court had no need to issue the injunction to preserve its ability to

---

without power to hold one in contempt for violating an injunction that the state court had no power to enter by reason of federal preemption." 369 U. S., at 692 (footnote omitted). The alleged circumstance that the court issuing the injunction had agreed to its violation as an appropriate means of testing its validity was considered only in a concurring opinion. Although the petitioner in *Green* had attempted to challenge the order in court before violating it, we did not rely on that fact in holding that the order was void. Nor is it clear to me why the Court regards this fact as important, unless it means to imply that the petitioners in this case would have been free to violate the court order if they had first made a motion to dissolve in the trial court.

[10] *United States* v. *United Mine Workers,* 330 U. S. 258 (1947).

decide some underlying dispute, the city had no need of an injunction to impose a criminal penalty for demonstrating on the streets without a permit. The ordinance already accomplished that. In point of fact, there is only one apparent reason why the city sought this injunction and why the court issued it: to make it possible to punish petitioners for contempt rather than for violating the ordinance, and thus to immunize the unconstitutional statute and its unconstitutional application from any attack. I regret that this strategy has been so successful.

It is not necessary in this case to decide precisely what limits should be set to the *Mine Workers* doctrine in cases involving violations of the First Amendment. Whatever the scope of that doctrine, it plainly was not intended to give a State the power to nullify the United States Constitution by the simple process of incorporating its unconstitutional criminal statutes into judicial decrees. I respectfully dissent.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE FORTAS concur, dissenting.

We sit as a court of law functioning primarily as a referee in the federal system. Our function in cases coming to us from state courts is to make sure that state tribunals and agencies work within the limits of the Constitution. Since the Alabama courts have flouted the First Amendment, I would reverse the judgment.

Picketing and parading are methods of expression protected by the First Amendment against both state and federal abridgment. *Edwards* v. *South Carolina,* 372 U. S. 229, 235–236; *Cox* v. *Louisiana,* 379 U. S. 536, 546–548. Since they involve more than speech itself and implicate street traffic, the accommodation of the public and the like, they may be regulated as to the times

and places of the demonstrations. *Schneider* v. *State,* 308 U. S. 147, 160–161; *Cox* v. *New Hampshire,* 312 U. S. 569; *Poulos* v. *New Hampshire,* 345 U. S. 395, 405–406. But a State cannot deny the right to use streets or parks or other public grounds for the purpose of petitioning for the redress of grievances. See *Hague* v. *C. I. O.,* 307 U. S. 496, 515–516; *Schneider* v. *State,* 308 U. S. 147, 163; *Cox* v. *New Hampshire,* 312 U. S. 569, 574; *Valentine* v. *Chrestensen,* 316 U. S. 52, 54; *Jamison* v. *Texas,* 318 U. S. 413, 415–416.

The rich can buy advertisements in newspapers, purchase radio or television time, and rent billboard space. Those less affluent are restricted to the use of handbills (*Murdock* v. *Pennsylvania,* 319 U. S. 105, 108) or petitions, or parades, or mass meetings. This "right of the people peaceably to assemble, and to petition the Government for a redress of grievances," guaranteed by the First Amendment, applicable to the States by reason of the Fourteenth (*Edwards* v. *South Carolina, supra,* at 235), was flouted here.

The evidence shows that a permit was applied for. Mrs. Lola Hendricks, a member of the Alabama Christian Movement for Human Rights, authorized by its president, Reverend Shuttlesworth, on April 3, went to the police department and asked to see the person in charge of issuing permits. She then went to the office of Commissioner Eugene "Bull" Connor and told him that "we came up to apply or see about getting a permit for picketing, parading, demonstrating." She asked Connor for the permit, "asked if he could issue the permit, or other persons who would refer me to, persons who would issue a permit." Commissioner Connor replied, "No, you will not get a permit in Birmingham, Alabama to picket. I will picket you over to the City Jail." On April 5, petitioner Shuttlesworth sent a telegram to Commissioner Connor requesting a permit to picket on designated side-

walks on April 5 and 6. The message stated that "the normal rules of picketing" would be observed. The same day, Connor wired back a reply stating that he could not individually grant a permit, that it was the responsibility of the entire Commission and that he "insist[ed] that you and your people do not start any picketing on the streets in Birmingham, Alabama." Petitioners' efforts to show that the City Commission did not grant permits, but that they were granted by the city clerk at the request of the traffic division were cut off.

The record shows that petitioners did not deliberately attempt to circumvent the permit requirement. Rather they diligently attempted to obtain a permit and were rudely rebuffed and then reasonably concluded that any further attempts would be fruitless.

The right to defy an unconstitutional statute is basic in our scheme. Even when an ordinance requires a permit to make a speech, to deliver a sermon, to picket, to parade, or to assemble, it need not be honored when it is invalid on its face. *Lovell* v. *Griffin,* 303 U. S. 444, 452–453; *Thornhill* v. *Alabama,* 310 U. S. 88, 97; *Jones* v. *Opelika,* 316 U. S. 584, 602, adopted *per curiam* on rehearing, 319 U. S. 103, 104; *Cantwell* v. *Connecticut,* 310 U. S. 296, 305–306; *Thomas* v. *Collins,* 323 U. S. 516; *Staub* v. *City of Baxley,* 355 U. S. 313, 319.

By like reason, where a permit has been arbitrarily denied, one need not pursue the long and expensive route to this Court to obtain a remedy. The reason is the same in both cases. For if a person must pursue his judicial remedy before he may speak, parade, or assemble, the occasion when protest is desired or needed will have become history and any later speech, parade, or assembly will be futile or pointless.

*Howat* v. *Kansas,* 258 U. S. 181, states the general rule that court injunctions are to be obeyed until error is found by normal and orderly review procedures. See

*United States* v. *Mine Workers,* 330 U. S. 258, 293–294. But there is an exception where "the question of jurisdiction" is "frivolous and not substantial." *Id.,* at 293. Moreover, a state court injunction is not *per se* sacred where federal constitutional questions are involved. *In re Green,* 369 U. S. 689, held that contempt could not be imposed without a hearing where the state decree bordered the federal domain in labor relations and only a hearing could determine whether there was federal pre-emption. In the present case the collision between this state court decree and the First Amendment is so obvious that no hearing is needed to determine the issue.

As already related, petitioners made two applications to Commissioner "Bull" Connor for a permit and were turned down. At the trial, counsel for petitioners offered to prove through the city clerk that the Commission never has granted a permit, the issuing authority being the city clerk who acts at the request of the traffic division. But he was not allowed to answer the question. And when asked to describe the practice for granting permits an objection was raised and sustained.

It is clear that there are no published rules or regulations governing the manner of applying for permits, and it is clear from the record that some permits are issued. One who reads this record will have, I think, the abiding conviction that these people were denied a permit solely because their skin was not of the right color and their cause was not popular.

A court does not have *jurisdiction* to do what a city or other agency of a State lacks *jurisdiction* to do. The command of the Fourteenth Amendment, through which the First Amendment is made applicable to the States, is that no "State" shall deprive any person of "liberty" without due process of law. The decree of a state court is "state" action in the constitutional sense (*Shelley* v.

*Kraemer,* 334 U. S. 1, 14–18), as much as the action of the state police, the state prosecutor, the state legislature, or the Governor himself. An ordinance—unconstitutional on its face or patently unconstitutional as applied—is not made sacred by an unconstitutional injunction that enforces it. It can and should be flouted in the manner of the ordinance itself. Courts as well as citizens are not free "to ignore all the procedures of the law," to use the Court's language. The "constitutional freedom" of which the Court speaks can be won only if judges honor the Constitution.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS, and MR. JUSTICE FORTAS join, dissenting.

Under cover of exhortation that the Negro exercise "respect for judicial process," the Court empties the Supremacy Clause of its primacy by elevating a state rule of judicial administration above the right of free expression guaranteed by the Federal Constitution. And the Court does so by letting loose a devastatingly destructive weapon for suppression of cherished freedoms heretofore believed indispensable to maintenance of our free society. I cannot believe that this distortion in the hierarchy of values upon which our society has been and must be ordered can have any significance beyond its function as a vehicle to affirm these contempt convictions.

## I.

Petitioners are eight Negro ministers. They were convicted of criminal contempt for violation of an *ex parte* injunction issued by the Circuit Court of Jefferson County, Alabama, by engaging in street parades without a municipal permit on Good Friday and Easter Sunday 1963. These were the days when

Birmingham was a world symbol of implacable official hostility to Negro efforts to gain civil rights, however peacefully sought. The purpose of these demonstrations was peaceably to publicize and dramatize the civil rights grievances of the Negro people. The underlying permit ordinance made it unlawful "to organize or hold . . . or to take part or participate in, any parade or procession or other public demonstration on the streets . . ." without a permit. A permit was issuable by the City Commission "unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused."

Attempts by petitioners at the contempt hearing to show that they tried to obtain a permit but were rudely rebuffed by city officials were aborted when the trial court sustained objections to the testimony. It did appear, however, that on April 3, a member of the Alabama Christian Movement for Human Rights (ACMHR) was sent by one of the petitioners, the Reverend Mr. Shuttlesworth, to Birmingham city hall to inquire about permits for future demonstrations. The member stated at trial:

> "I asked [Police] Commissioner Connor for the permit, and asked if he could issue the permit, or other persons who would refer me to, persons who would issue a permit. He said, 'No, you will not get a permit in Birmingham, Alabama to picket. I will picket you over to the City Jail,' and he repeated that twice."

Two days later the Reverend Mr. Shuttlesworth sent a telegram to Police Commissioner Connor requesting a permit on behalf of ACMHR to picket on given dates "against the injustices of segregation and discrimination." Connor replied that the permit could be granted only by the full Commission and stated, "I insist that you and your people do not start any picketing on the streets in

Birmingham, Alabama." Petitioners were also frustrated in their attempts at the contempt hearing to show that permits were granted, not by the Commission, but by the city clerk at the request of the traffic department, and that they were issued in a discriminatory manner.

On April 6–7 and April 9–10, Negroes were arrested for parading without a permit. Late in the night of April 10, the city requested and immediately obtained an *ex parte* injunction without prior notice to petitioners. Notice of the issuance was given to five of the petitioners on April 11.[1] The decree tracked the wording of the permit ordinance, except that it was still broader and more pervasive. It enjoined:

> ". . . engaging in, sponsoring, inciting or encouraging mass street parades or mass processions or like demonstrations without a permit, trespass on private property after being warned to leave the premises by the owner or person in possession of said private property, congregating on the street or public places into mobs, and unlawfully picketing business establishments or public buildings in the City of Birmingham, Jefferson County, State of Alabama or performing acts calculated to cause breaches of the peace in the City of Birmingham, Jefferson County, in the State of Alabama or from conspiring to engage in unlawful street parades, unlawful processions, unlawful demonstrations, unlawful boycotts, unlawful trespasses, and unlawful picketing or other like unlawful conduct or from violating the ordinances of the City of Birmingham and the Statutes of the State of Alabama or from doing any acts designed to consummate conspiracies to engage in said un-

---

[1] Two petitioners received no personal notice of the injunction at all. The trial court found that they were aware of the injunction, a conclusion here challenged. Because of the disposition I would make of this case, I would not reach this issue.

lawful acts of parading, demonstrating, boycotting, trespassing and picketing or other unlawful acts, or from engaging in acts and conduct customarily known as 'kneel-ins' in churches in violation of the wishes and desires of said churches. . . ."

Several of the Negro ministers issued statements that they would refuse to comply with what they believed to be, and is indeed, a blatantly unconstitutional restraining order.

On April 12, Good Friday, a planned march took place, beginning at a church in the Negro section of the city and continuing to city hall. The police, who were notified in advance by one of the petitioners of the time and route of the march, blocked the streets to traffic in the area of the church and excluded white persons from the Negro area. Approximately 50 persons marched, led by three petitioners, Martin Luther King, Ralph Abernathy, and Shuttlesworth. A large crowd of Negro onlookers which had gathered outside the church remained separate from the procession. A few blocks from the church the police stopped the procession and arrested, and jailed, most of the marchers, including the three leaders.

On Easter Sunday another planned demonstration was conducted. The police again were given advance notice, and again blocked the streets to traffic and white persons in the vicinity of the church. Several hundred persons were assembled at the church. Approximately 50 persons who emerged from the church began walking peaceably. Several blocks from the church the procession was stopped, as on Good Friday, and about 20 persons, including five petitioners, were arrested. The participants in both parades were in every way orderly; the only episode of violence, according to a police inspector, was rock throwing by three onlookers on Easter Sunday, after petitioners were arrested; the three rock throwers were immediately taken into custody by the police.

On Monday, April 15, petitioners moved to dissolve the injunction, and the city initiated criminal contempt proceedings against petitioners. At the hearing, held a week later, the Jefferson County Court considered the contempt charge first. Petitioners urged that the injunction and underlying permit ordinance were impermissibly vague prior restraints on exercise of First Amendment rights and that the ordinance had been discriminatorily applied. The court, however, limited evidence primarily to two questions: notice of and violation of the injunction. The court stated that "the validity of its injunction order stands upon its prima facie authority to execute the same." Petitioners were found guilty of criminal contempt and sentenced to five days in jail and a $50 fine. The Alabama Supreme Court, adopting the reasoning of *United States* v. *Mine Workers,* 330 U. S. 258, applicable to federal court orders, affirmed, holding that the validity of the injunction and underlying permit ordinance could not be challenged in a contempt proceeding. 279 Ala. 53, 181 So. 2d 493.

II.

The holding of the Alabama Supreme Court, and the affirmance of its decision by this Court, rest on the assumption that petitioners may be criminally punished although the parade ordinance and the injunction be unconstitutional on their faces as in violation of the First Amendment, and even if the parade ordinance was discriminatorily applied. It must therefore be assumed, for purposes of review of the Alabama Supreme Court's decision, and in assessing the Court's affirmance, that petitioners could successfully sustain the contentions (into which the Alabama courts refused to inquire) that the ordinance and injunction are in fact facially unconstitutional as excessively vague prior restraints on First Amendment rights and that the ordinance had been dis-

criminatorily applied. It should be noted, without elab-
oration, that there is clearly sound basis in fact for this
assumption: the Alabama Court of Appeals, in a case
involving one of these petitioners, has held that the ordi-
nance is "void for vagueness because of overbroad, and
consequently meaningless, standards for the issuance of
permits for processions," and that the ordinance has been
enforced discriminatorily. *Shuttlesworth* v. *City of Bir-
mingham,* 43 Ala. App. 68, 180 So. 2d 114 (1965). How-
ever, it is not the merits of such claims, but the refusal
of the Alabama courts to consider them, that is here
involved.[2]

Like the Court, I start with the premise that States
are free to adopt rules of judicial administration designed
to require respect for their courts' orders. See *Howat* v.
*Kansas,* 258 U. S. 181.[3] But this does not mean that this

---

[2] Thus not an issue here is the extent of the State's right to con-
trol the manner of use of its streets and sidewalks. Since the
Alabama courts refused to consider the merits of petitioners' con-
stitutional claims it must be assumed for purposes of review that
the ordinance and injunction were invalid attempts to exercise such
control.

In *Kasper* v. *Brittain,* 245 F. 2d 92, both the District Court and
the Court of Appeals afforded the appellant full consideration of
his First Amendment contention and found it to be without merit.
In that circumstance, the language of the opinion of the Court of
Appeals, 245 F. 2d, at 96, presented no issue for this Court's review.

[3] It should be noted that the State's interest in the integrity of
its injunctive remedy in the present case is of a different order than
that embodied in our *Mine Workers* rule. The injunctive remedy
was not here necessary to preserve the *status quo* while a case was
pending decision, but was merely the conversion of a broad statutory
restraint into a broader injunctive restraint of indefinite duration,
unrelated to any pending litigation. This Court's decision in *Mine
Workers* was directed to the integrity of the District Court's power
"to preserve existing conditions while it was determining its own
authority to grant injunctive relief." *United States* v. *Mine
Workers,* 330 U. S. 258, 293. In *Howat* v. *Kansas,* 258 U. S. 181,
the state court's order related to a pending proceeding before the
state "Court of Industrial Relations." The State's interest is here

valid state interest does not admit of collision with other and more vital interests. Surely the proposition requires no citation that a valid state interest must give way when it infringes on rights guaranteed by the Federal Constitution. The plain meaning of the Supremacy Clause requires no less.

In the present case we are confronted with a collision between Alabama's interest in requiring adherence to orders of its courts and the constitutional prohibition against abridgment of freedom of speech, more particularly "the right of the people peaceably to assemble," and the right "to petition the Government for a redress of grievances." See, *e. g., Stromberg* v. *California,* 283 U. S. 359; *De Jonge* v. *Oregon,* 299 U. S. 353; *Thornhill* v. *Alabama,* 310 U. S. 88; *Edwards* v. *South Carolina,* 372 U. S. 229; *Cox* v. *Louisiana,* 379 U. S. 536. Special considerations have time and again been deemed by us to attend protection of these freedoms in the face of state interests the vindication of which results in prior restraints upon their exercise,[4] or their regulation in a vague or overbroad manner,[5] or in a way which gives unbridled discretion to limit their exercise to an individual or group of individuals.[6] To give these freedoms the necessary "breathing space to survive," *NAACP* v. *Button,* 371 U. S. 415, 433, the Court has modified traditional rules of standing and prematurity. See *Dombrowski* v.

---

further limited by the traditional rule of equity jurisdiction that equity does not normally restrain criminal acts but that the State should proceed by criminal prosecution with its attending safeguards.

[4] See, *e. g., Near* v. *Minnesota,* 283 U. S. 697, 713–720; *Freedman* v. *Maryland,* 380 U. S. 51, 57–60.

[5] See, *e. g., Keyishian* v. *Board of Regents,* 385 U. S. 589; *Baggett* v. *Bullitt,* 377 U. S. 360, 372–373; *Cramp* v. *Bd. of Public Instruction,* 368 U. S. 278, 287–288.

[6] See, *e. g., Staub* v. *City of Baxley,* 355 U. S. 313; *Lovell* v. *Griffin,* 303 U. S. 444; *Schneider* v. *State,* 308 U. S. 147; *Cantwell* v. *Connecticut,* 310 U. S. 296.

*Pfister,* 380 U. S. 479. We have molded both substantive rights and procedural remedies in the face of varied conflicting interests to conform to our overriding duty to insulate all individuals from the "chilling effect" upon exercise of First Amendment freedoms generated by vagueness, overbreadth and unbridled discretion to limit their exercise.

The vitality of First Amendment protections has, as a result, been deemed to rest in large measure upon the ability of the individual to take his chances and express himself in the face of such restraints, armed with the ability to challenge those restraints if the State seeks to penalize that expression. The most striking examples of the right to speak first and challenge later, and of peculiar moment for the present case, are the cases concerning the ability of an individual to challenge a permit or licensing statute giving broad discretion to an individual or group, such as the Birmingham permit ordinance, despite the fact that he did not attempt to obtain a permit or license. In *Staub* v. *City of Baxley,* 355 U. S. 313, the accused, prosecuted for soliciting members for an organization without a permit, contended that the ordinance was invalid on its face because it made exercise of freedom of speech contingent upon the will of the issuing authority and therefore was an invalid prior restraint— the same contention made by petitioners with regard to the Birmingham ordinance. The Georgia Court of Appeals held that "[h]aving made no effort to secure a license, the defendant is in no position to claim that any section of the ordinance is invalid or unconstitutional . . . ." *Staub* v. *City of Baxley, supra,* at 318. We refused to regard this holding as an adequate nonfederal ground for decision, stating, *supra,* at 319:

> "The decisions of this Court have uniformly held that the failure to apply for a license under an ordinance which on its face violates the Constitution

> does not preclude review in this Court of a judgment of conviction under such an ordinance. *Smith* v. *Cahoon,* 283 U. S. 553, 562; *Lovell* v. *Griffin,* 303 U. S. 444, 452. 'The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands.' *Jones* v. *Opelika,* 316 U. S. 584, 602, dissenting opinion, adopted *per curiam* on rehearing, 319 U. S. 103, 104."

See also *Cox* v. *Louisiana,* 379 U. S. 536, 556–557.

Yet by some inscrutable legerdemain these constitutionally secured rights to challenge prior restraints invalid on their face are lost if the State takes the precaution to have some judge append his signature to an *ex parte* order which recites the words of the invalid statute. The State neatly insulates its legislation from challenge by mere incorporation of the identical stifling, overbroad, and vague restraints on exercise of the First Amendment freedoms into an even more vague and pervasive injunction obtained invisibly and upon a stage darkened lest it be open to scrutiny by those affected. The *ex parte* order of the judicial officer exercising broad equitable powers is glorified above the presumably carefully considered, even if hopelessly invalid, mandates of the legislative branch. I would expect this tribunal, charged as it is with the ultimate responsibility to safeguard our constitutional freedoms, to regard the *ex parte* injunctive tool to be far more dangerous than statutes to First Amendment freedoms. One would expect this Court particularly to remember the stern lesson history taught courts, in the context of the labor injunction, that the *ex parte* injunction represents the most devastating of restraints on constitutionally protected activities. Today, however, the weapon is given complete invulnerability in the one context in which the danger from broad

prior restraints has been thought to be the most acute. Were it not for the *ex parte* injunction, petitioners could have paraded first and challenged the permit ordinance later. But because of the *ex parte* stamp of a judicial officer on a copy of the invalid ordinance they are barred not only from challenging the permit ordinance, but also the potentially more stifling yet unconsidered restraints embodied in the injunction itself.

The Court's religious deference to the state court's application of the *Mine Workers'* rule in the present case is in stark contrast to the Court's approach in *In re Green,* 369 U. S. 689. The state court issued an *ex parte* injunction against certain labor picketing. Green, counsel for the union, advised the union that the order was invalid and that it should continue to picket so that the order could be tested in a contempt hearing. The court held Green in contempt without allowing any challenge to the order. This Court stated that the issue was "whether the state court was trenching on the federal domain." *In re Green, supra,* at 692. It remanded for a hearing to determine whether the activity enjoined was "arguably" subject to Labor Board jurisdiction. In *Green,* therefore, we rejected blind effectuation of the State's interest in requiring compliance with its court's *ex parte* injunctions because of the "arguable" collision with federal labor policy. Yet in the present case the Court affirms the determination of a state court which was willing to assume that its *ex parte* order and the underlying statute were repugnant on their face to the First Amendment of the Federal Constitution. One must wonder what an odd inversion of values it is to afford greater respect to an "arguable" collision with federal labor policy than an assumedly patent interference with constitutional rights so high in the scale of constitutional values that this Court has described them as being "delicate and vulnerable, as well as supremely

precious in our society." *NAACP* v. *Button,* 371 U. S. 415, 433.

It is said that petitioners should have sought to dissolve the injunction before conducting their processions. That argument is plainly repugnant to the principle that First Amendment freedoms may be exercised in the face of legislative prior restraints, and *a fortiori* of *ex parte* restraints broader than such legislative restraints, which may be challenged in any subsequent proceeding for their violation. But at all events, prior resort to a motion to dissolve this injunction could not be required because of the complete absence of any time limits on the duration of the *ex parte* order. See *Freedman* v. *Maryland,* 380 U. S. 51. Even the Alabama Supreme Court's Rule 47 leaves the timing of full judicial consideration of the validity of the restraint to that court's untrammeled discretion.

The shifting of the burden to petitioners to show the lawfulness of their conduct prior to engaging in enjoined activity also is contrary to the principle, settled by *Speiser* v. *Randall,* 357 U. S. 513, 526, that

> "The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens. . . . In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free."

The suggestion that petitioners be muffled pending outcome of dissolution proceedings without any measurable time limits is particularly inappropriate in the setting of this case. Critical to the plain exercise of the right of protest was the timing of that exercise. First, the marches were part of a program to arouse community

support for petitioners' assault on segregation there. A cessation of these activities, even for a short period, might deal a crippling blow to petitioners' efforts. Second, in dramatization of their cause, petitioners, all ministers, chose April 12, Good Friday, and April 14, Easter Sunday, for their protests hoping to gain the attention to their cause which such timing might attract. Petitioners received notice of the order April 11. The ability to exercise protected protest at a time when such exercise would be effective must be as protected as the beliefs themselves. Cf. *Ex parte Jackson,* 96 U. S. 727, 733; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 248–250; *Lovell* v. *Griffin,* 303 U. S. 444, 452. It is a flagrant denial of constitutional guarantees to balance away this principle in the name of "respect for judicial process." To preach "respect" in this context is to deny the right to speak at all.

The Court today lets loose a devastatingly destructive weapon for infringement of freedoms jealously safeguarded not so much for the benefit of any given group of any given persuasion as for the benefit of all of us. We cannot permit fears of "riots" and "civil disobedience" generated by slogans like "Black Power" to divert our attention from what is here at stake—not violence or the right of the State to control its streets and sidewalks, but the insulation from attack of *ex parte* orders and legislation upon which they are based even when patently impermissible prior restraints on the exercise of First Amendment rights, thus arming the state courts with the power to punish as a "contempt" what they otherwise could not punish at all. Constitutional restrictions against abridgments of First Amendment freedoms limit judicial equally with legislative and executive power. Convictions for contempt of court orders which invalidly abridge First Amendment freedoms must be condemned equally with convictions for violation of statutes which do the same thing. I respectfully dissent.