City of Chicago, a Municipal Corporation, Orlando W. Wilson, Superintendent of Police of the City of Chicago, Plaintiffs-Appellees, v. Rev. Dr. Martin Luther King, et al., Defendants, Frank Ditto, Defendant-Appellant.

Gen. No. 51,792.

First District, Fourth Division.

August 31, 1967.

Rehearing denied and opinion modified
September 28, 1967.

Stanley Bass, Richard F. Watt, and Irving M. King, of Chicago (Stanley A. Bass and Cotton, Watt, Jones & King, of counsel), for appellant Frank Ditto.

Lee J. Vickman and Richard R. Elledge, of Chicago, for American Civil Liberties Union, Illinois Division, amicus curiae.

Raymond F. Simon, Corporation Counsel, of Chicago (Thomas A. Foran, Special Assistant Corporation Counsel, and Robert E. Wiss, of counsel), for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

On September 6, 1966, defendant Frank Ditto was convicted of criminal contempt and sentenced to six months in the County Jail. He appeals, contending: (a) the temporary injunction order which he was alleged to have violated and upon which his contempt conviction was based, was unconstitutional and therefore void; (b) it was therefore error to refuse to allow collateral attack upon such order at his trial for contempt; (c) he was unconstitutionally denied a trial by jury; and (d) he was not shown to have violated the injunction.

On August 19, 1966, a verified complaint by the City of Chicago and its Superintendent of Police was filed in the Circuit Court seeking an injunction order restraining defendants, as individuals and collectively as various groups of citizens, from conducting, organizing, or participating in unreasonable demonstrations in support of a petition for the redress of alleged grievances; towit:

(A) From organizing, conducting or participating in any march, assembly, gathering or meeting on public property in more than one specific area of, or location in the City of Chicago on any given date.

(B) From conducting (etc.) . . . any such march (etc.) . . . unless such march (etc.) . . . is limited to such numbers as will not obstruct traffic, either vehicular or pedestrian, in an unreasonable manner, and, in any event, . . . be limited in size to 500 persons or less.

(C) From conducting (etc.) . . . any such march (etc.) . . . unless the Police Department of the City of Chicago has been given notice in writing of the location, number of people participating, and the names of the organizers of any such march . . . , its route, and time of

inception, at least twenty-four (24) hours prior to its inception.

(D) From conducting (etc.) . . . any such march (etc.) . . . except during daylight hours and at times other than peak traffic periods (7:30 a. m. to 9:00 a. m. and 4:30 p. m. to 6:00 p. m.).

In this and the following six paragraphs we shall outline the allegations of the complaint. Defendants had in recent years adopted a form of concerted action described as "civil rights marches" or "civil rights demonstrations" as a method of petitioning for redress of their alleged grievances under the Constitutions of the United States and Illinois. During 1965 and 1966, in Chicago, these demonstrations had included a number of marches involving several thousand people, conducted under permit and in an orderly manner. However, during the same period, defendants had organized other marches and demonstrations conducted without permits, and during the course of which there were many civil disturbances resulting in the arrest of 1,372 persons. During June, July and August 1965, defendants organized and participated in almost daily "vigils" in numbers varying from several to several hundred persons before the City Hall and other public buildings. In the latter part of 1965 and through the winter and spring of 1966, many other demonstrations were organized by defendants involving similar numbers of people. Throughout this period, the Chicago police in no way attempted to interfere with the marches and demonstrations, but, on the contrary, affirmatively assisted and protected all those involved who were peaceful and orderly.

In January 1966, defendants and others advised City officials and the news media that they intended to embark upon a program of developing "creative tension" in the City of Chicago throughout the ensuing summer.

343

During June and July 1966, while defendants were making public statements, appearing on news media, issuing news releases, and publicly corresponding with city officials in the course of organizing people in several areas of the city, major civil disturbances erupted. These resulted in damages of more than several millions of dollars to private property, the death of 27 persons, and injury to 374 others, including 61 police officers. In order to contain the disturbances on the west side of Chicago, it became necessary for the Illinois National Guard to assist the police, and in the course of these disturbances, over 536 persons were arrested.

During July and August of 1966, defendants adopted a pattern of demonstrating in individual neighborhoods in Chicago in diverse areas at approximately the same time, each such demonstration consisting of a substantial number of people, usually several hundred. Particularly, on August 14, 1966, three groups of demonstrators went into three separate neighborhoods, Gage Park, Bogan and Jefferson Park, each of which is separated from the others by substantial distance. The times of the demonstrations were either simultaneous or overlapping. While the three demonstrations were occurring, a severe civil disturbance involving several hundred people, and also concerning "civil rights" marches, erupted in the Marquette Park area, adjoining Bogan.

On August 16, defendants organized six groups of demonstrators which proceeded to six separate locations in the downtown area of Chicago and demonstrated during the day. On the same date, six groups of demonstrators organized by defendants, returned to the Jefferson Park neighborhood at dark and proceeded to demonstrate until after midnight.

At each of these "neighborhood demonstrations," large crowds other than the demonstrators, varying in size from several hundred to several thousand people, gathered along the line of march carrying signs, hooting,

344

throwing rocks, firecrackers and other missiles at the marchers, thereby endangering the persons and property of the marchers and other citizens, as well. Several dozen automobiles belonging to the marchers and others were burned or otherwise substantially damaged. Access to the sidewalks was denied to nonparticipating citizens, the normal flow of pedestrian and vehicular traffic was obstructed, substantial damage was done to private property along the routes of march, and 177 persons were arrested. During each of these marches and demonstrations, the Chicago police assisted and protected all those engaged therein who conducted themselves in a peaceful and orderly manner, and in no way did the police attempt to interfere with them.

Despite repeated requests by the police that adequate notice of marches and demonstrations be provided to the Police Department, and despite repeated assurances by defendants that such notice would be given (the latest assurance being August 4, 1966 by defendant Martin L. King), written notification of the locations, character and extent of the demonstrations was received by the police before only two of the more than two hundred such demonstrations. On no other occasion was notice given which was accurate, timely and verifiable. This failure to provide notice caused an extensive and unreasonable waste of police man power which would otherwise have been used for crime prevention and detection in other areas of the city. During the marches and demonstrations from July 16 to August 16, in order to protect the marchers and the persons and property of citizens who were neither participating in the marches nor in the attacks on the marchers, it was necessary for the Police Department to assign 7,124 men to special duty for the specific purpose of protecting the marchers and others in only six neighborhoods within the City of Chicago. These assignments to special duty removed policemen from normal duty posts in other areas and re-

duced police protection in those areas to such an extent that there resulted a substantial increase in crimes against persons and property directly attributable to such lessened police protection. The effective police patrol force on a normal watch is approximately 1,020 men, exclusive of detectives, traffic and juvenile officers. The burden placed upon the Police Department because of simultaneous marches at widely separated locations in the city is illustrated by the fact that the three marches on August 14 required assignment to special duty of 1,279 policemen.

Although defendants were requested to cease and desist from placing this unreasonable burden on the Police Department and on the rights of other citizens to have their persons and property protected by the City, the defendants not only continually refused and threatened to continue the demonstrations in said unwarranted and injurious manner, but also threatened to expand the demonstrations into many other neighborhoods at simultaneous times. The police and city officials were informed that this course of action was imminent, and averred that if defendants were permitted to conduct simultaneous marches, it would be impossible for the police to protect the marchers, demonstrators and public and private property and persons of the more than $3\frac{1}{2}$ million citizens of the city, who were not participating as marchers or as protestors, from the clear and present danger of riot, civil disturbance, and the deleterious effects of unreasonably overburdened police duties. Defendants' actions during the month of August, and particularly on the 14th and 16th, and their announced intention to expand the demonstrations into many neighborhoods at simultaneous times, constituted a clear and present danger to the order, peace and quiet, health, safety, morals and welfare of the City of Chicago. Plaintiffs recognized the right of defendants to conduct reasonable demonstrations in furtherance of their right to

call attention to their petition for redress of alleged grievances, but alleged that the pattern of action described in the complaint did not constitute reasonable demonstration in support of such petition, and that the restraints sought were reasonable and not in violation of any rights of defendants guaranteed by the Constitutions of the United States and of Illinois. Then followed the prayer of the complaint which has been set forth above.

On August 19, 1966, an order was issued by the chancellor granting the relief sought in the form of a temporary injunction and incorporating the language in the prayer of the complaint. At the hearing on plaintiffs' motion which resulted in this injunction, defendant Ditto was present in court and made no objection thereto.

Thereafter, plaintiffs filed a Petition for a Rule to Show Cause, which petition recited the entry of the temporary injunction on August 19, and alleged that it had been served on defendant Ditto (hereinafter defendant) at 10:30 a. m. on August 22.

With a supporting affidavit by Police Sergeant Mulvey, the petition alleged that at 10:00 a. m. on August 22, defendant had held a press conference in the presence of news reporters and television cameras, during which he read a prepared statement, a copy of which was obtained by Mulvey at the time and later read into evidence at defendant's trial. In that statement, defendant said: "In the course of the last two years I have been arrested a total of fifteen times," and "[I]n each and every case I have considered it not a punishment but a privilege to participate in the process of constantly amended and improved interpretations of what we, at any given moment, consider to be the law of the land." Defendant then introduced himself as a law-abiding citizen who waits at traffic lights and pays his taxes, but who also tries to "live my life by laws greater than those which are strictly local—commandments

347

which begin with 'Love thy neighbor as thyself.'" Defendant then stated:

It is with this introduction of myself that *I choose to announce my conscious intent to defy the court injunction* issued by Judge Cornelius Harrington of the Circuit Court of Cook County on Friday, August 19th, 1966. (Emphasis supplied.)

Defendant then went on to say that the order "discriminates not against demonstrators in general but against particular demonstrators; and not against demonstrations, but specifically against Negroes." After some elaboration, defendant quoted from a telegram he sent to President Johnson and the Department of Justice in which he "consciously and willfully" announced his "intention of violating the injunction . . . ," explaining "[i]t is my belief that this injunction is an illegal and unwarranted usurpation of my Constitutional rights . . . ." He then requested the "immediate intervention of the Justice Department on my behalf . . . ," and claimed that if the Mayor and Superintendent of Police "are unable to control and maintain law and order during the peaceful process of the democratic system, then Martial Law and not unconstitutional court injunction is required."

Based on the affidavit of H. M. Pierson, District Commander of Police, the petition further alleged that on August 22, defendant violated the temporary injunction in that he held a march or demonstration at 7:20 p. m. in a residential area in the City of Chicago with no prior notice to police. (See "(C)" above.) This demonstration consisted of a march along the public sidewalk by defendant, seventeen adults and nine children. Although halted and warned by police that they were in violation of the notice provision of the injunction order, defendant and the others continued to march until they dispersed

at approximately 8:10 p. m. There were spectators present and the police addressed the demonstrators with a "blow horn." All these facts were set forth in the petition, and it was further alleged that in the normal course of activity, only eight to ten policemen would have been assigned to this entire area. On the evening of the 22nd, the assignment of police to the small area within a few blocks of the demonstration consisted of all the cars in the surrounding area (but for one wagon), four sergeants, twenty-two patrolmen from the task force, two policewomen and two officers from the juvenile division, two Captains and an acting Lieutenant.

On August 23, 1966, acting on plaintiffs' Petition for a Rule to Show Cause, the chancellor entered an order for the issuance of a citation directed to the defendant, commanding him to appear on August 25 "to show cause, . . . why he should not be punished for contempt of the court in violating the injunction order issued by this court on August 19, 1966."

A hearing was held on August 25, with defendant and his retained counsel present, at which both officers testified in support of the averments and affidavits of the petition which was admitted into evidence. The case was continued to August 26, and then, on defendant's motion, to September 6, when defense rested without offering any evidence to refute the plaintiffs' case, relying instead on the defense that the temporary injunction order abridged defendant's constitutional rights and was therefore void. The court refused to consider this question as relevant to the issues of whether it had jurisdiction of the parties and of the subject matter, and of whether defendant was guilty of contempt of court for having violated the order. The court also refused defendant's timely request for a trial by jury.

■ The first and major question on this appeal is whether it was a denial of defendant's constitutional

rights for the trial court to have refused to consider the constitutionality of its temporary injunction at defendant's trial for contempt of court in having violated that order. It was not. Walker v. City of Birmingham, 388 US 307, 87 S Ct 1824 (1967). In that case, city officials filed a complaint alleging that continuance of marches and demonstrations in violation of the local parade ordinance threatened the safety, peace and tranquility of the City and placed an undue burden and strain upon the man power of the Police Department, and that the remedy at law was inadequate. The court entered a temporary injunction restraining petitioners from marching in violation of the ordinance. Petitioners then held a press conference "declaring their intention to disobey the injunction" (at page 1826), did violate it, and when tried for contempt of the issuing court, attempted to attack the constitutionality of the injunction. The trial court, noting that petitioners had neither tried to comply with the order nor moved to have it dissolved, refused to consider the collateral questions of constitutionality of the injunction or of the parade ordinance, and "held that the only issues before it were whether it had jurisdiction to issue the temporary injunction, and whether thereafter the petitioners had knowingly violated it." (At page 1827.) In affirming the trial court, the United States Supreme Court adopted the opinion of the Supreme Court of Alabama, saying at page 1828:

"It is to be remembered that petitioners are charged with violating a temporary injunction. We are not reviewing a denial of a motion to dissolve or discharge a temporary injunction. Petitioners did not file any motion to vacate the temporary injunction until after the . . . parades. Instead, petitioners deliberately defied the order of the court and

350

did engage in and incite others to engage in mass street parades without a permit."

. . . . . .

"We hold that the circuit court had the duty and authority, in the first instance, to determine the validity of the ordinance, and, until the decision of the circuit court is reversed for error by orderly review, either by the circuit court or a higher court, the orders of the circuit court based on its decision are to be respected and disobedience of them is contempt of its lawful authority, to be punished. Howat v. State of Kansas, 258 US 181." 279 Ala 53, 60, 62–63, 181 So2d 493, 500, 502.

The court (at page 1829) rejected the contention of petitioners there (as we do here) that this rule is constitutionally impermissible, and that the constitution compels a state court to allow violation of an injunction "without any previous effort . . . to have the injunction dissolved or modified, or any attempt to [comply] with its terms."

In re Green, 369 US 689, cited by defendant, was distinguished in the Walker opinion (at page 1829) as a case wherein the state court which issued the labor injunction, upon which contempt was grounded, was without jurisdiction over the subject matter because of the federal preemption doctrine.[1] On the issue of jurisdiction

---

[1] The Court further noted that the petitioners in Green, unlike those in Walker (and here), had attempted to challenge the validity of the injunction prior to violating it by asking that it be vacated, and also that the petitioners in Green had offered to prove that the issuing court had agreed to violation of the order as an appropriate means of testing its validity.

The distinction made on the ground of lack of jurisdiction due to federal preemption also applies to Bus Employees v. Wisconsin Board, 340 US 383. Another case cited by defendant, National

in Walker, the Court held, as do we in the instant case, that "[w]ithout question the state court that issued the injunction had, as a court of equity, jurisdiction over the petitioners and over the subject matter of the controversy." (At page 1829.) The reason for state court jurisdiction of this subject matter was ascribed to "the strong interest of state and local governments in regulating the use of their streets and other public places." Distinguishing between the freedom to "communicate ideas by pure speech," as opposed to the communication of ideas by "conduct such as patrolling, marching, and picketing on streets and highways," (citing Cox v. Louisiana, 379 US 536, 555), the court quoted from its unanimous decision in Cox v. New Hampshire, 312 US 569, 574:

> "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend." (87 S Ct at 1829–1830.)

---

Ass'n for Advancement of Colored People v. Alabama, 357 US 449, involved civil contempt for failure to produce membership lists and is distinguishable from criminal contempt for an affront to the judicial process in the instant case. It should also be noted that the Supreme Court in National Ass'n for Advancement of Colored People v. Alabama, at pp 466–467, specifically refused to consider the attack made on an ex parte temporary order restraining further solicitation of support in the state as not being properly before that court since it had not yet been judicially considered in the state courts.

The court noted that both the injunction order and the Birmingham parade ordinance upon which it was based would unquestionably raise constitutional questions, but emphasized that orderly judicial review is the method by which those questions must be raised, again quoting with approval from a decision of the Alabama Supreme Court:

> "As a general rule, an unconstitutional statute is an absolute nullity and may not form the basis of any legal right or legal proceedings, yet until its unconstitutionality has been judicially declared in appropriate proceedings, no person charged with its observance under an order or decree may disregard or violate the order or the decree with immunity from a charge of contempt of court; and he may not raise the question of its unconstitutionality in collateral proceedings on appeal from a judgment of conviction for contempt of the order or decree." 273 Ala, at 590, 143 So2d at 180. (87 S Ct at 1832.)

In the instant case, the temporary injunction was not cast in terms of a statute or ordinance. It was based, rather, upon a prayer for the exercise of the court's general equity powers, and was issued to meet an emergency situation. In the nature of such proceedings, a hearing would be held later to decide whether the injunction should be made permanent. This introduces an element lacking in the Walker case but one which does not alter the result, and could, for that matter, produce the same result on its own, supported by a somewhat different but related line of cases. On appeal of a conviction for contempt for violation of a temporary restraining order, the Supreme Court held in United States v. Mine Workers, 330 US 258, 293:

> In the case before us, the District Court had the power to preserve existing conditions while it was

determining its authority to grant injunctive relief. The defendants, in making their own private determination of the law, acted at their peril. Their disobedience is punishable as criminal contempt.[2]

 In Illinois, as elsewhere, contempt will not lie for violation of a void decree (DuPage v. Molitor, 26 Ill App2d 232, 237–238, 167 NE2d 592), but voidness is established when the issuing court is found to have lacked jurisdiction to enter such an order. In re Green, 369 US 689. The Illinois decisions have been in accord with the federal cases in holding that if the issuing court has the necessary jurisdiction, its order, no matter how erroneous, must be obeyed, until set aside, under pain of contempt. Cummings-Landau Co. v. Koplin, 386 Ill 368, 54 NE2d 462; Faris v. Faris, 35 Ill2d 305, 309, 220 NE2d 210; Stern v. Stern, 40 Ill App2d 374, 380–381, 188 NE2d 97. The test of jurisdiction is said to be whether the court has power to enter into the inquiry before it, and this is determined by (1) jurisdiction of the parties, (2) jurisdiction of the subject matter, and (3) power in the court to decide the particular matters presented. All such factors being present, the correctness of the court's determination has no bearing upon the initial question of jurisdiction. 12 ALR2d 1059, 1066.

Against this proposition, it may be argued that unconstitutional court orders, like unconstitutional statutes, are void ab initio, and that, therefore, no court can acquire jurisdiction to issue an unconstitutional decree. However, this argument ignores the situation presented here, where the court issued a temporary injunction in an emergency situation pending its later decision, or that

---

[2] The Court, in Mine Workers (at pp 293–294), declared itself in accord with Howat v. Kansas, 258 US 181, as did the court in Walker, where Mine Workers was cited as authority, but was not discussed.

of a higher court, as to whether it had the authority to grant the permanent injunctive relief prayed for. An individual may not take it upon himself to deprive the court of this opportunity. To do so is to invite conviction for contempt of the court irrespective of whatever decision the court might subsequently reach on the merits of the complaint before it. And, as we have seen, the issue as to whether or not contempt had been committed was the only question properly before the trial court in this case. Again quoting from the Walker opinion:

> The rule of law . . . followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion. This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets. One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom. 87 S Ct at 1832.

■■ Defendant's second argument is also unavailing. There is no constitutional right to trial by jury for one accused of criminal contempt:

> This claim has been made and rejected here again and again. Only six years ago we held a full review of the issue in Green v. United States, (356 US 165, 183). We held there that "[t]he statements of this Court in a long and unbroken line of decisions involving contempts ranging from misbehavior in court to disobedience of court orders establish beyond peradventure that criminal contempts are not

subject to jury trial as a matter of constitutional right." United States v. Barnett, 376 US 681, 692. See also People ex rel. Chicago Bar Ass'n v. Barasch, 21 Ill2d 407, 410, 173 NE2d 417.

■ ■ The third and last argument in defendant's brief has already been answered in this opinion insofar as it questions whether defendant's conduct was of a type which an injunction could constitutionally proscribe. Otherwise, defendant does not argue that his conduct was not in violation of Paragraph "(C)" of the injunction (quoted above) in that he did not provide written notice to the Police Department in advance of his march. Nor does he suggest that he did not knowingly and wilfully violate the injunction. The evidence upon which defendant was convicted of contempt was uncontroverted and was sufficient to warrant the judgment of the trial court.

After his conviction defendant asked the chancellor to fix a bond so that he might be at large pending appeal. His request was denied. A substantial period of time then elapsed, during which defendant was in jail, before he made a similar request of this court, which was allowed with bond of $1,000. On oral argument, counsel for defendant urged us to decide—if we were to affirm the finding of contempt—that the time defendant has already spent in jail is sufficient punishment for the offense. While we believe we would have the authority to reduce the sentence as requested (People v. Hodge, 23 Ill2d 425, 178 NE2d 354), we shall not exercise it here.

Despite the almost incredible advances today in communication facilities, the facility to communicate appears to have declined. Perhaps it has always been true, but surely our society has never suffered more acutely from the use of the same word or term by different persons with different meanings intended. An outstanding ex-

ample is the wide range of thought which has sought expression in the political term, "liberal," to the point of rendering it meaningless for all practical purposes. And so it is with the concept, "civil disobedience." In the halls of learning, this term may be used in philosophical discussion of the theories advocated by Thoreau, and with quite similar meaning, it may also be applied to the guiding principles of Gandhi. Their non-materialistic revolutionary doctrines of passive resistance, however, contained no preachment that laws and courts could be defied with impunity. But today their same words—"civil disobedience"—are often employed in public forum in a context that seems to contemplate the breaking of "unjust laws" without penalty. Thus, after urging disrespect for law and the courts in the name of "civil disobedience," it is then customary to seek the protection of that same judicial arm of government against serious retribution or punishment.

Whatever "civil disobedience" may mean when used on the air or in press reports of interviews or speeches, when the words have made their way to the level of the streets and are put into action, they are apt to be understood as meaning "disorderly conduct," "resisting arrest," and the like. In the case before us, "civil disobedience" translated into legal terminology comes out, "criminal contempt of court," and should be punished accordingly.

█ The essence of defendant's contempt is his wilful disrespect for the authority of the court's injunction. The nature of this review is such that we have no way of knowing, nor can we ascertain, whether defendant's attitude toward the court remains as contumacious as it was when the decree was entered. If it has changed full circle—from one of disobedience to one of obedience—and if he is able to demonstrate such change to the satisfaction of the chancellor who entered the contempt order, that court would be the proper forum

357

in which defendant should make application for reduction of sentence under these circumstances.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and McCORMICK, JJ., concur.