### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### Arnold KIMMES, et al., Defendants.

### No. 89 C 5942.

United States District Court, N.D. Illinois, E.D.

Aug. 21, 1990.

---

Anita M. Nagler and Gregory P. von Schaumburg, S.E.C., Chicago, Ill., for plaintiff.

Richard Ben–Veniste, Peter D. Isakoff, Weil, Gotshal & Manges, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On August 3, 1989 the Securities and Exchange Commission ("SEC") brought this action against 14 individuals and two corporations, charging a large-scale securities fraud in the marketing and sale of low-priced securities (so-called "penny stocks"). This opinion deals with problems attendant on SEC's claims against Thomas Quinn ("Quinn"), who has been incarcerated throughout the pendency of this litigation at the Maison d'Arret de la Sante in Paris, France.[1]

---

1. Though the precise particulars of Quinn's French problems are not at all relevant for current purposes, this Court understands that Quinn has been in custody there for, and is facing charges asserting, other allegedly fraudulent activities as well as those related to this litigation. According to papers submitted by Quinn's counsel on his behalf in this action, Quinn had already been in the French prison for an entire year *before* this case was filed.

## Procedural Background

Almost immediately after suit was brought, SEC sought and obtained—upon making the proper showing—a temporary restraining order ("TRO") against Quinn and four other defendants that froze their funds and other assets. Then on August 15, 1989 this Court, as permitted by Fed.R. Civ.P. ("Rule") 65(b), extended the TRO to September 1, 1989 and ordered that the preliminary injunction hearing be held at 9:45 a.m. August 30, 1989. Before that date SEC filed a motion seeking additional preliminary injunctive relief against violations of the anti-fraud, reporting and recordkeeping provisions of the federal securities laws, all as alleged in the Complaint.

By the time the August 30 date for the preliminary injunction hearing arrived, Quinn was the only defendant who still posed a live issue in terms of further preliminary injunctive relief. As for the other four defendants who had originally been temporarily restrained, by August 30 codefendants Arnold Kimmes and Michael Wright had consented to preliminary injunctive relief without admitting or denying the Complaint's allegations except as to jurisdiction, while both corporate defendants had defaulted so as to give rise to final judgments against them.

At the time set for the hearing no one appeared on Quinn's behalf, nor were any requests made for a continuation of the hearing. This Court therefore considered everything in the record before it and on September 1, 1989 entered a preliminary injunction order (the "Order") in accordance with Rules 52(a) and 65(d). In part the Order included the following finding based on SEC's representations to that effect:

> This Court has personal jurisdiction over defendant Quinn and defendant Quinn received proper notice of the preliminary injunctive hearing.[2]

And in addition to its other provisions prohibiting further securities law violations by Quinn, Order ¶ 9 contained the following injunctive command that now serves as the focus of the current disputes between Quinn and SEC:

> 9. Defendant Quinn, his agents, servants, employees and attorneys and those persons in active concert or participation with any of the foregoing who receive actual notice of this Order by personal service or otherwise, and each of them, are preliminarily restrained and enjoined from directly or indirectly transferring, selling, assigning, pledging, dissipating, concealing or otherwise disposing of in any manner, any funds, assets or other property, wherever located, belonging to or in the possession, custody or control of defendant Quinn or his immediate family.

On January 25, 1990 SEC moved for an order to show cause, seeking to hold Quinn in civil contempt for violation of that provision of the Order. SEC pointed to Quinn's having caused the transfer of $75,000 about November 15, 1989—nearly two months after he had been personally served with a copy of the Order[3]—from a brokerage account in the United States to attorney Philippe Cywan ("Cywan") in the United Kingdom.[4] Three months later SEC

---

**2.** [Footnote by this Court] At the time of the preliminary injunction hearing, SEC counsel had represented orally to this Court that they had spoken to Quinn's lawyers in both Washington, D.C. and France, and that Quinn's counsel had acknowledged receipt of the motion papers and the delivery of those documents to Quinn himself. That assertion has never been disputed by Quinn's lawyers—their quarrel lies instead with SEC's assertion as to its having obtained personal jurisdiction over Quinn (and in that respect Quinn's position is based on SEC's claimed noncompliance with the applicable service-of-process requirements).

**3.** SEC's January 25 motion said that such service on Quinn had been accomplished September 21. 1989 (Ex. B to that motion is the certificate and return of service). Quinn has not disputed that.

**4.** Quinn acknowledges that he did that. But what he glosses over—or more accurately, prefers to ignore entirely—is that the brokerage account from which the funds were transferred is one that he maintains under the alias Georgios Samaras. According to SEC, Quinn's use of aliases is a regular part of his modus operandi—and although this Court is not in a position to confirm that, the record *does* include a Greek passport bearing Quinn's photograph and issued

identified still another transfer of funds that Quinn had assertedly made in contravention of the Order's provisions in early February 1990.

In the meantime Quinn went on the counterattack, seeking three types of relief:

1. his dismissal from the action because of a claimed insufficiency in the service of process;

2. a stay of the action as to him; and

3. a modification of the Order so that he could obtain funds to pay his lawyers.[5]

All the motions have received extensive briefing, generating a nearly-two-inch-thick pile of paper.[6]

Fortunately a later development has mooted a material part of Quinn's multi-pronged onslaught. Ben–Veniste has now accepted service and has appeared on Quinn's behalf, and on June 27, 1990 Quinn has filed his Answer, so that the fully-briefed dismissal motion need not occupy this Court as an independent matter. Instead this opinion will focus briefly on the stay question and the related proposed modification of the Order, then will devote the principal part of its discussion to the contempt issues.[7]

## Stay of the Action

■ Quinn urges that the proceedings be stayed as to him because his imprisonment in France disables him from effective participation in the action. In that respect he seeks to don the constitutional mantle of the Due Process Clause.

That garb is of course available to saint and malefactor alike. Justice Frankfurter has said in another time and place (in his dissent in *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950)):

It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people.[8]

But Quinn's invocation of the Due Process Clause ill suits him under the circumstances here.

For one thing, it has already been said that Quinn engaged in self-help—in the very teeth of the flat prohibition contained in the Order—to divert $75,000 to his own use. Once he did that (by means fair or—as clearly appears to be the case—foul), it became *his* choice as to how those funds would be employed. Ben–Veniste's office has tendered a June 27, 1990 affidavit from Cywan, which says that Quinn opted to use that money for what Cywan describes as "safeguarding and preserving Mr. Quinn's

in that false name (Ex. H to SEC's January 25 motion). And as if that were not bad enough, Ex. G to the same motion (the brokerage house new account card, made out when Quinn opened the account) identifies the bogus "Samaras" as a "Greek national" whose business was "financial consultant"—even though the listed address and telephone number in Mougins, France were those of Quinn himself.

5. On October 3, 1989 this Court did grant a limited modification of the Order to allow payment to Washington, D.C. attorney Richard Ben–Veniste ("Ben–Veniste") of reasonable attorneys' fees and expenses (not to exceed $12,000) for Ben–Veniste's upcoming trip to Paris to confer with Quinn. And on June 25, 1990 another $5,925 was authorized to be paid to Ben–Veniste's firm for fees and expenses—a disbursement that was not opposed by SEC and, in all candor, one that this Court permitted more out of sympathy for Ben–Veniste's situation than out of any conviction that Quinn was entitled to it as a matter of right. But this Court has denied Quinn any further relief of the same

type to this point, especially in light of Quinn's having made the unauthorized $75,000 transfer to Cywan in direct contravention of the Order. More on this subject later.

6. All too frequently federal judges are subjected to such a diet, rich in bulk though not necessarily in fiber.

7. To be sure, the question of sufficiency of the earlier service of process on Quinn must be taken into account in conjunction with one aspect of the contempt question. But as will be demonstrated in the ensuing text, the effectiveness or ineffectiveness of the initial service of process does not control whether Quinn should (or can) be held in contempt of court.

8. [Footnote by this Court] That point of view is more likely to find its way into Supreme Court dissents these days as well. And indeed Justice Brennan's dissenting opinion in *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 703, 102 L.Ed.2d 835 (1989) expressly recalled Justice Frankfurter's classic *Rabinowitz* statement to mind.

assets." Rather than attempting to paraphrase Cywan's affidavit (which should be read for a full understanding of why Quinn's present position is so untenable), this Court attaches it as an appendix to this opinion. What is significant of course is that, once having latched onto the $75,000 and having chosen which of his fish he wanted to fry with those funds, Quinn will simply not be heard to bootstrap himself at this point by urging that the *government* has somehow violated his due process rights by making his defense financially impossible.

On that score SEC disputes Quinn's entitlement to a due process claim at all where, as here, he is incarcerated under the regular procedures of law (see, e.g., our Court of Appeals' opinions in *Jones v. Hamelman*, 869 F.2d 1023, 1029–30 (7th Cir. 1989) and *Stone v. Morris*, 546 F.2d 730, 735–37 (7th Cir.1976); and cf. *McKinney v. Boyle*, 447 F.2d 1091, 1094 (9th Cir.1971)). Relatedly SEC urges that the cases advanced by Ben–Veniste on this issue— cases purportedly standing for the proposition that due process demands that Quinn be afforded more meaningful contact with

his lawyer than he has had—do not support Quinn's contentions.

There is a good deal of force to SEC's position on both those propositions. Nor is Quinn persuasive in his contention that he is deprived of due process by the circumstances under which his lawyers have access to confer with him in la Sante Prison. Even apart from the dubious factual predicate for any such argument,[9] nothing in the case law that he invokes calls for such a conclusion.[10] Having said all that, however, this Court need not resolve this matter based on any perceived lack of entitlement on Quinn's part to the protections of due process as such. Instead it is quite enough to rest on the point made two paragraphs back. No violation of due process has been shown under the circumstances here.

One additional matter does bear brief mention in this area. It has already been said that this is a multi-defendant action. What has not been mentioned until now is the other side of the litigation—the fact that SEC sues as surrogate for a large investing public whose interests must also be taken into account. Again no showing

---

9. Ben–Veniste and Cywan complain of the restraints that are assertedly imposed on lawyer-client relationships by the French legal system. But Chief Investigator Stanley Whitten ("Whitten") of SEC's Chicago Regional Office says this in his April 25, 1990 affidavit:

> On Thursday, April 12, 1990, I had a telephone conversation with Francois Sarref, who identified himself as one of defendant Quinn's lawyers in France. The conversation was in English and Mr. Sarref spoke fluent English. Mr. Sarref told me that his office regularly received documents relating to this case from the SEC addressed to one of the other lawyers in his office, Maitre H. LeClerc. He further told me that he visits with defendant Quinn at the jail every week and, among other things, discusses the filings made in this case.

And somewhat relatedly, even though it is urged on Quinn's behalf that he professedly has no knowledge at all of French, here is an affidavit from Colin Tongs provided by SEC as Ex. A to that Whitten affidavit:

> 1. I am a British citizen and have resided in Miami and Kissimmee Florida since 1978.
> 2. I have known an individual named Thomas Quinn ("Quinn") who goes by the nickname, "Tommy" since at least 1982. The Quinn I know is the same individual who is a defendant in the civil action.

> 3. On several occasions during the period of 1984 up until 1988, I went to dinner with Quinn in France, both in Paris, Mougins, and Cannes and observed him conversing with waiters in French, in addition, I have been a guest at La Mas des Roses, Quinn's residence in Mougins, France and observed him conversing in French with his French staff and workman, who were doing extensive renovations of his home.

As is consistently true of Quinn's conduct during this case, the assertions made on his behalf thus do not inspire much confidence either. However, this opinion does not rest at all on the quite understandable doubts raised as to the assertions made on Quinn's behalf in either respect referred to in this footnote.

10. It is worth noting that our Court of Appeals last year reconfirmed the concept that indigent civil litigants (as contrasted with criminal defendants) have no constitutional right to counsel (*DiAngelo v. Illinois Department of Public Aid*, 891 F.2d 1260, 1262 (7th Cir.1989)). For the reasons already stated in the text, it is unnecessary to decide whether a civil litigant in Quinn's situation has any better call on the Due Process Clause—though Quinn really advances nothing but the ipse dixit conclusion that he does.

has been made by Quinn to justify the extraordinary step of blocking all proceedings for a wholly indeterminate period.

In sum, there is more than one reason for denying Quinn the relief that he seeks. This Court rejects any stay of the proceedings.

### Contempt of Court

■ As stated under "Procedural Background," SEC's motion for an order to show cause sought a finding of civil contempt against Quinn. But its initial January 25, 1990 filing, which comported with the civil contempt concept by asking for coercive relief (Mem. 6), also said (*id.* n. 1):

> These remedies are all civil in nature as they are designed to coerce defendant Quinn to comply with the preliminary injunction. *See, U.S. v. Jones,* 880 F.2d 987, 989 (7th Cir.1989). Defendant Quinn's contempt may also be criminal and nothing in the SEC's motion should be read as precluding his prosecution for criminal contempt.[11]

Quinn rests his entire response not at all on any claimed defense on the merits, but solely on this assertion (Quinn Opposition at 2):

> It is fundamental that a preliminary injunction against a party to an action is not effective until such time as the Court has obtained jurisdiction over him, either through effective service of process or the entry of a general appearance.

And 7 (Part 2) *Moore's Federal Practice* ¶ 65.03[3], at 65–27 to 65–29 (1989), quoted by Quinn at length, does support that concept.

But to this Court that proposition is not at all enough to resolve the issue, for the claimed unavailability of *civil* contempt as a remedy does not exculpate Quinn. After all, he has arrogantly and surreptitiously flouted a court order of which he was fully cognizant. No one has the right to do that even if such a court order is downright void. That has been crystal clear for nearly a half-century. It cost the United Mine Workers of America $3.5 million to learn that lesson—at a time when that represented real money (*United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947)).[12]

■ Indeed, so powerful is the notion that litigants must observe the regularized form of judicial proceedings by moving to vacate even a void court order, rather than engaging in self-help by ignoring it, that such obligation prevails even where the litigant's conduct involves the exercise of First Amendment rights (see, e.g., *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967)). Only a rarely-entered small window of exception exists "where the injunction was transparently invalid or had only a frivolous pretense to validity" (*id.* at 315, 87 S.Ct. at 1829), the classic example being where the injunction imposes a patently unconstitutional prior restraint on pure speech (see, e.g., *In re Providence Journal Co.,* 820 F.2d 1342, 1345–49 (1st Cir.1986)).[13]

■ True enough, both *United Mine Workers,* 330 U.S. at 293, 67 S.Ct. at 696, and *Walker,* 388 U.S. at 315, 87 S.Ct. at 1829, have spoken in terms of the enjoining court having jurisdiction not only over the subject matter but over the person. But in the context of *preliminary* injunctive relief such as that granted by the Order, that requirement must be read simply in terms

---

11. [Footnote by this Court] That potential of Quinn's prosecution for criminal contempt has been repeated at SEC's July 25 Reply Mem. 2 n. 1.

12. See Cox, *The Void Order and the Duty To Obey,* 16 U.Chi.L.Rev. 86 (1948). That article specifically disclaimed discussion of the in personam jurisdiction issues dealt with later in this opinion: "questions relating to jurisdiction over the person will be put aside" (*id.* at 87).

13. While this Court was a private practitioner, it was retained by the Reporters' Committee for Freedom of the Press, on a pro bono basis, to appear as amicus curiae in *Cooper v. Rockford Newspapers, Inc.,* 50 Ill.App.3d 250, 8 Ill.Dec. 508, 365 N.E.2d 746 (2d Dist.1977). There the Illinois Appellate Court (*id.* at 257, 8 Ill.Dec. at 513, 365 N.E.2d at 751) accepted and adopted the argument that this Court advanced to enable the alleged contemnor to enter that small window of exception. Indeed *Cooper* was cited for the rare exception to the *Walker* principle in *Providence Journal,* 820 F.2d at 1348 n. 37.

of *notice* to the enjoined party (see not only Rule 65(a)(1) but such cases as *People ex rel. Hartigan v. Peters*, 871 F.2d 1336, 1340 (7th Cir.1989)) rather than as demanding the existence of in personam jurisdiction via service of process. If it were otherwise, the entire structure of Rule 65—with its basic concept of issuing *binding* TROs and preliminary injunctions—would be sapped of strength entirely.[14] Nose-thumbing conduct such as Quinn's is unquestionably subject to the sanction of criminal contempt (*see, e.g., Waffenschmidt v. Mackay*, 763 F.2d 711, 716–22 (5th Cir.1985)), whatever the situation may be as to civil contempt with its purely coercive motivation.

At the time that Quinn diverted $75,000 to his own ends in flagrant contravention of the Order, he was not only already represented by Ben–Veniste but had actually sought and obtained through Ben–Veniste a *modification* of the Order—the issuance of this Court's October 3, 1989 order authorizing payment of $12,000 to enable Ben–Veniste to travel to Paris to counsel with Quinn about this case. Quinn unquestionably knew of the Order; he and his lawyer knew how to seek relief from the Order from this Court; and in fact his lawyer's September 25, 1989 affidavit and contemporaneous memorandum seeking the release of $12,000 from the flat-out prohibition imposed by the Order first sounded the now-familiar tocsin of due process of law as the

predicate for obtaining such relief (Sept. 25, 1989 Mem. at 3).

Was Quinn's $75,000 withdrawal, and what appears to have been a later withdrawal of funds in February 1990,[15] anything *but* a direct contempt of court? Criminal contempt, by its very nature, involves a justifiable vindication of a court's own authority for just such court-order-violative activity.[16]

Accordingly Quinn and his counsel are ordered to show cause, by a supplemental filing on or before September 7, 1990, why Quinn should not be held in criminal contempt of the Order by reason of the conduct dealt with in this opinion.[17] On or before the same date SEC is ordered to file a submission as to the appropriate sanction to impose against Quinn if such criminal contempt is found (including as well a statement of its position on the procedural issue referred to in n. 16).

### What of the Future?

At this point the Order still stands. Quinn's memoranda have contended it is erroneous as a matter of law, but Ben–Veniste has never moved formally to vacate it. Even if such a motion were to be filed, what reason is there—given Quinn's now having submitted to this Court's jurisdiction and his being formally before this Court—that the Order should not be reinstated immediately in every respect? Quinn has tendered nothing to suggest the substantive insufficiency of the predicates

14. Indeed, Rule 65(b) expressly provides—under appropriate circumstances—for the granting of preliminary injunctive relief *without notice*. If that were a nullity, as Quinn would have it, several centuries of equity jurisprudence would have to be overturned.

15. All the facts of that latter situation have never been developed. However, with all the volume of Quinn's filings, he and his lawyers have uttered no word of denial that such a further siphoning-off took place. Nonetheless this opinion does not rest in any respect on the existence or nonexistence of that claimed second transfer.

16. Because of (1) the likelihood that Quinn's conduct may trigger of a criminal contempt holding and (2) the further likelihood of reinstatement of the Order even if it were to be vacated (see the later discussion under "What of

the Future?"), there seems no need to resolve the issues as to civil contempt. Given the probability that any coercive sanctions of that type would fall if the Order were to be vacated (a result that has not yet been sought by Quinn in express terms), the question would likely become moot—subject to revival if the Order were then reinstated. In the meantime it would seem that complete relief could be afforded via a ruling of criminal contempt plus appropriate sanctions.

17. That filing should include a statement of position as to the procedures required for the determination on that score. Moreover, it is time for Quinn to account for the facts as to the second claimed diversion of funds (see n. 15) and any other transfers that may have taken place, and Quinn's counsel is ordered to include that information in the supplemental filing.

on which the Order was based. Accordingly the parties' September 7 submissions should address that question as well.

### Conclusion

Quinn's motion to be dismissed as a defendant has been rendered moot by his appearance and Answer. His motion for a stay is denied. Final ruling on SEC's motion for a finding of civil contempt is further deferred, pending the parties' submissions on or before September 7, 1990 as to questions bearing on the imposition of criminal contempt citations.

This action is set for a telephonic status hearing at 8:45 a.m. C.D.S.T. on September 13, 1990 to discuss the future procedures dealt with in the new submissions. That arrangement will spare Ben–Veniste the expense of a trip to Chicago for such a purely procedural discussion.

### APPENDIX

### City of Paris

### Country of France

### AFFIDAVIT OF PHILIPPE CYWAN

I, Philippe Cywan, being duly sworn, hereby depose and say:

1. For more than one year I represented the interests of Mr. Thomas F. Quinn in connection with various legal matters in France and England. I make this affidavit at the request of Mr. Quinn's United States counsel, Richard Ben–Veniste, in order to bring to the Court's attention facts surrounding the transfer of some $75,000 from an account controlled by Mr. Quinn in November 1989. This affidavit does not constitute any waiver of the attorney-client privilege and is made only for the unique and limited purpose of responding to the Court's specific inquiry. I can assure the Court that the $75,000 was transferred for the purpose of safeguarding and preserving Mr. Quinn's assets.

2. The purpose of the $75,000 transfer was to engage Beechcroft Stanleys, a well-regarded firm of lawyers in London, England, and to assure them that funds necessary for fees and disbursements were on hand. The circumstances surrounding the need for payment are as follows.

3. Jenkins and Davies (J & D) is an English engineering company supplying specialized works and services to, among others, petroleum refinery construction contractors. At the time of Mr. Quinn's arrest in July 1988, he was the beneficial owner of approximately 92% of the shares of J & D, though the shares were still registered in the names of those from whom he had acquired them or who had acquired them on his behalf. A Mr. Davies is the managing director of J & D, and was, until the first quarter of this year, the minority shareholder of J & D.

4. In 1986, J & D executed a refinery construction contract as subcontractor to Chemical & Thermal Ltd. (C & T). The agreed contract price resulted in a substantial underpayment to J & D, however, principally because the required quantity of steam piping was far greater than shown on the original C & T drawings. It is fairly clear that the drawings were switched at some stage in the negotiations, and that J & D therefore has a good claim under the arbitration clause of the contract. Although the claim is for well in excess of £700,000, it is conservatively valued at around £600,000. C & T, which is a member of a substantial group of public companies, is believed to be solvent.

5. As the result of not being paid, J & D was in substantial financial difficulties, and, in particular, unable to finance the arbitration proceedings. The Beechcroft firm estimated fees and costs to total some £120,000, but it is my hope to come to a more reasonable arrangement with J & D's original advisors, who are a provincial firm of lawyers and a quantity surveyor, and who are both willing to act on a partial contingent fee basis.

6. Finisco is a trust company owned by a Geneva lawyer named Crosier. Sometime prior to Mr. Quinn's arrest, Finisco, acting on behalf of Mr. Quinn, loaned a total of £300,000 to J & D against the security of the assignment of its arbitration claim. By September 1988, the debt had risen to £350,000 with interest.

7. Although an assignment agreement relating to the arbitration claim had been

executed, Mr. Crosier neglected to register it within twenty-one days, as required by the English Companies Act. Consequently, the charge was void as against creditors, and meanwhile the company had reached the stage of insolvency without having made a real start in prosecuting the arbitration claim.

8. When Mr. Crosier learned of Mr. Quinn's arrest, he took various steps on his own. He informed Mr. Davies that no further loans could be made, to which Davies responded that the company would be bankrupt unless Crosier agreed to allow the share capital of J & D to be increased so as to give Davies (or his nominee) a large majority in exchange for an insignificant capital contribution. Davies maintained that he could only obtain funds to keep the company going if he, and/or his new financier, had majority ownership of the company. Without Mr. Quinn's authorization, Crosier said that he agreed to the capital increase, though this was not carried out.

9. At this point I consulted with Mr. Quinn and received his authorization to try to recover what I could on the arbitration claim and to take what steps I could to protect J & D's assets and Mr. Quinn's stake therein.

10. After lengthy correspondence, meetings and discussions with Mr. Davies, a possible basis for agreement began to emerge. During this period I appointed the Beechcroft firm to act in Mr. Quinn's behalf. I obtained a report from Peat Marwick & Mitchell, the accounting firm, which made it clear that the only hope of salvaging something out of the J & D situation was to reach an agreement with Davies, which I accomplished.

11. I asked Mr. Quinn to arrange for funds to guaranty the Beechcroft that funds would be available to finance the salvage operation and the prosecution of this claim. This was the purpose of the $75,000 transfer, and the reasons why the funds were made to my order.

12. It is my intention to press the arbitration claim in the hope of arriving at a settlement in the region of £500,000.

13. None of the aforementioned actions were taken with any intent to transgress any legal restrictions in the United States and it is regrettable if they have been misunderstood and inconvenience thereby caused.

/s/   Philippe Cywan

Philippe Cywan

Subscribed and sworn to before me,

this ———— day of ——————, 1990.

---

NOTARY PUBLIC